**EFS MARKETING, INC., Plaintiff,**

v.

**RUSS BERRIE & COMPANY, INC., and Russell Berrie, Defendants.**

**No. 91 Civ. 5515 (JFK).**

United States District Court, S.D. New York.

Sept. 27, 1993.

Paul, Hastings, Janofsky & Walker, New York City (Robert L. Sherman, of counsel), for plaintiff.

Weiss Dawid Fross Zelnick & Lehrman, P.C., New York City (Roger Zissu, of counsel), for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF ·LAW

KEENAN, United States District Judge:

### INTRODUCTION

Based upon a submitted record pursuant to Fed.R.Civ.P. 52, the parties have requested the Court to resolve their dispute.[1] Plaintiff, EFS Marketing, Inc. ("EFS"), alleges that defendants, Russ Berrie, Inc. ("Russ") and its president, Russell Berrie, fixed a false designation of copyright· to their troll dolls and infringed upon EFS's protected trade dress in violation of 15 U.S.C. § 1125(a) and state law. Defendants assert that plaintiff has failed to demonstrate the existence of trade dress rights or mismarking. The Court assumes familiarity with its Opinion concerning plaintiff's motion for a

---

1. The parties agreed to transform their cross-motions for summary judgment pursuant to Fed. R.Civ.P. 56 into a bench trial on submission.

preliminary injunction, *see EFS Marketing v. Russ Berrie & Co.*, 91 Civ. 5515 Opinion and Order, 1991 WL 275647, 1991 U.S.Dist. LEXIS 18203 (S.D.N.Y. Dec. 16, 1991) [*"EFS I"*]. For the reasons set forth below, Russ and EFS are enjoined from affixing a copyright mark on their lines of troll dolls. All of plaintiff's other claims are dismissed.

### FINDINGS OF FACT

#### A. The Parties

Plaintiff, EFS, is a corporation organized under the laws of New York State having its principal place of business in New York. Defendant Russ is a New Jersey corporation with its principal place of business in New Jersey. Defendant Russell Berrie is the Chairman of the Board, the Chief Executive Officer, and the majority shareholder of the corporate defendant.

Both sides in this dispute market lines of troll dolls. They are the seemingly omnipresent children's toys that assume various sizes and garb. While there are slight variations in the appearances of defendants' trolls and plaintiff's "Norfins" line of trolls, there are many similarities. Both are made of vinyl.or rubber. Both lines have outstretched arms and colorful hair that often stands up straight. Each has four toes on each foot and four fingers on each hand. Their faces are characterized by large, round eyes and broad, pronounced pug noses. These trolls are similar in appearance to the trolls that were originally designed by Thomas Dam, a Danish woodcarver. The Dam trolls were sold in the United States during the 1960's. Although Thomas Dam's troll design received United States copyright protection in late 1964 or early 1965, this original grant of protection was lost when the copyright was declared invalid in July of 1965. *See Scandia House Enter. v. Dam Things Establishment*, 243 F.Supp. 450 (D.D.C.1965); *EFS I*, 1991 WL 275647 at 1, 1991 U.S.Dist. LEXIS 18203 at 3. The *Scandia House* decision thrust the Dam trolls into the public domain for copyright purposes.

#### B. The Complaint

In this action, plaintiff's complaint focuses on the defendants' use of a copyright notice mark on their troll dolls, as well as on their marketing of a fully dressed family of troll dolls. These two practices have given rise to the complaint's four causes of action: (1) infringing trade dress and falsely designating origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *see* Complaint ¶ 24; (2) trading on plaintiff's good will, injuring its business reputation, and confusing the public in violation of state common-law prohibitions against unfair competition, *see id.* ¶ 27–28; (3) affixing a false designation of copyright to their troll dolls, also in violation Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), *see id.* ¶ 32–33; and (4) practicing trade deceptively in violation of Section 349 of the New York General Business Law. *See id.* ¶ 35. Besides demanding alleged damages arising from these claims, plaintiff seeks to enjoin defendants' alleged infringement of its trade dress, claiming that defendants' marketing of trolls substantially similar or identical to its own has resulted in public confusion over the two product lines. Plaintiff also attempts to hold defendant Russell Berrie personally liable for defendant corporation's practices.

#### C. The Russ Trolls

As noted in *EFS I*, 1991 WL 275647 at 2, 1991 U.S.Dist. LEXIS 18203 at 6, defendants' experience with troll dolls stretches back to 1960 or 1961, when Mr. Berrie became a sales representative for Scandia House, which was at that time was the licensee for American sales of the Thomas Dam troll design. *See* Preliminary Injunction Hearing, Oct. 30–31 & Nov. 1, 4, 1991 ["Record"] at 260–62; Berrie Affidavit (9/25/91) ¶ 8. Mr. Berrie then formed his own company, defendant Russ, in 1963, though he continued to serve as a sales representative for other companies until 1965.

Following the *Scandia House* decision invalidating Dam's copyright, several companies, including Royalty Design, which had been manufacturing trolls for Scandia House, began to market trolls on their own. *See* Berrie Affidavit (9/25/91) ¶¶ 8–9. In 1967 and in 1972, Mr. Berrie's company purchased troll dolls from Royalty Design and sold

them directly. *See id.*[2] In 1974, Russ purchased the assets of Royalty Design, including the molds for troll dolls, in a bankruptcy sale. The company changed the name of Royalty Design to "Creative Manufacturing, Inc." *See id.* ¶ 10; Record at 274–5. In 1975, Russ reintroduced troll dolls made using the molds obtained from Royalty Design. Starting that year, the company sold both three-inch naked trolls, and twelve-inch boy and girl trolls that were dressed. *See* Berrie Affidavit (9/25/91) ¶ 10; *see also id.*, Exhibit G (color photocopy from 1976 catalogue, showing naked 3–inch trolls and dressed 12–inch trolls). Russ continued to sell these trolls from 1975 through 1979. *See id.* ¶ 10. During this time, RUSS sold approximately 4700 dressed trolls. *See* Record at 314–15.

In 1982, as part of Russ's pattern of introducing and reintroducing the troll product line, Russ re-introduced the naked 3–inch troll dolls in 1982. *See* Berrie Affidavit (9/25/91) ¶ 11; *see* Record at 284; *see also* Berrie Affidavit (9/25/91), Exhibit I; Record at 276. Sale of those trolls continued through 1984. *See* Berrie Affidavit (9/25/91) ¶ 11; Record at 276.

From 1985 to 1987, defendants sold no trolls. Then in late 1987, RUSS reintroduced its troll pencil toppers, which Russ had successfully sold in 1967. *See* Monson Affidavit (9/25/91) ¶ 2; Record at 375, 379–80. The success of the pencil topper trolls caused RUSS to expand its troll line. *See* Monson Affidavit (9/25/91) ¶ 3; Record at 288–91. This expansion included the development of a line of dressed troll dolls, first designed in the Far East in September of 1989 and first sold in June 1990. *See* Monson Affidavit (9/25/91) ¶¶ 7–8. In developing their line of dressed trolls, defendants drew from their marketing of other dressed characters, such as the "Lovey Bear," which was sold in 1984 in ballerina, bikini, aerobics, cheerleader and nurse versions, and "Lester the Looney Bird," which was marketed in 1985 in clown, ballerina, golf pro and cowboy versions. *See id.* ¶ 5. During the 1980's, defendants also marketed a variety of "families" of animals dressed in similar outfits, including the Teddy Family, the Cat Society, the Bear Family and various mice families. *See id.*

Since late 1987, defendants have attempted to alter the sculpture design of the basic troll design that had been hurled into the public domain for copyright purposes with the *Scandia House* decision. The alterations allegedly include the chin coming after smile line; rounded ears; brown rye color; eyes closer together; head disproportionate in size to body; no blush on cheeks; flatter shorter chest length; scalloped round digits on hand; softly rounded eyelids; short space between nose and mouth; width of hairline longer; rounded bottom; longer legs in proportion to body; and no gradation in toes' size. *See* Simon Affidavit (12/28/92), Exhibit 10. According to defendants, the end result of these changes is "newer, cuter, more human-like and friendlier" versions of the public domain troll doll. *See* Defendants' Proposed Findings of Fact and Conclusions of Law ¶ 7. Despite these alleged changes, defendants' troll dolls are in fact indistinguishable from the public domain doll.

Since 1988, RUSS has placed a copyright notice reading "© RUSS" on the bottom of the left foot of the troll dolls. *See id.* ¶ 10. RUSS obtained copyright registrations from the U.S. Copyright Office for its newer troll dolls in April and August of 1991. *See* Berrie Affidavit (9/25/91) ¶ 15 & Exhibit A. On August 18, 1992, the United States Customs Service, Intellectual Property Branch, announced that it would not enforce defendants' copyrights covering two of its new troll figurines, the 3½–inch troll dolls and 4–inch troll dolls, which Customs concluded lacked sufficient originality to prevent others from importing similar goods. *See* Affidavit in Support of Plaintiff's Motion for Summary Judgment, Exhibit G (Department of Treasury, U.S. Customs Service's Legal Opinion re Russ Berrie's Troll Doll Copyright, dated Aug. 18, 1992) at 10–11. Customs has since amended this decision, declaring that although it will recognize the validity of copyrights covering trolls, its "enforcement of these copyrights will be narrow in scope as dictated by the numerous copyrights issued

---

**2.** At the preliminary injunction hearing, defendants supplied the Court with Russ's 1972 catalogue, which advertised naked, 2½–inch trolls. *See* Berrie Affidavit (9/25/91), Exhibit F at 26.

covering substantially similar features of these dolls." (Department of Treasury, U.S. Customs Service's Legal Opinion re Russ Berrie's Request for· Reconsideration, dated Aug. 23, 1993) at 9.

### D. *The EFS Trolls*

EFS, founded in 1982 by Steven and Eva Stark, entered into an agreement with "Dam Things," the manufacturer of the original troll doll whose general manager was Nils Dam, the son of the creator of the 1961 troll doll. Pursuant to this agreement, EFS ·became the sole marketer of Dam Thing's trolls in the United States.[3] EFS adopted the name "Norfins" for the trolls and used it as a trademark for the product. *See* Stark Affidavit (August 1991) ¶¶ 15–18 & Exhibit E (Dam Things—EFS Exclusive Distributorship and License Agreement). Inspired by the success of another line, the Smurf dolls, EFS adopted the marketing concept of selling a group or family of dressed trolls. *See EFS I*, 1991 WL 275647 at 5, 1991 U.S.Dist. LEXIS 18203 at 11; Record at 55–56. EFS started with such characters as "a clown, bride and groom, sailor, a girl in an exercise outfit, a girl in a nightgown, and a boy in a karate suit" and has continually expanded its troll line since 1982. *EFS I*, 1991 WL 275647 at 5, 1991 U.S.Dist. LEXIS 18203 at 11–12; Stark Affidavit (August 1991) ¶¶ 25, 26. As of 1991, EFS had marketed over 125 troll characters. *See EFS I*, 1991 WL 275647 at 5, 1991 U.S.Dist. LEXIS 18203 at 12. Like the RUSS troll dolls, the EFS troll characters are hardly distinguishable from the original Dam trolls. Marketing via trade shows and sales catalogues, EFS had managed to sell approximately $12 million worth of troll dolls from 1982 to the inception of this lawsuit. *See* Record at 103–04, 148–50; Defendants' Exhibit X. EFS also affixes copyright notices in the name of "Dam" to most of its trolls marketed today and has obtained copyright registrations for these newer versions of the 1961 troll doll. *See* Stark Deposition (October 25, 1991) at 134–35.

3. The practical effect of this agreement was severely diminished by the fact that the Dam troll was in the public domain for copyright purposes,

### E. *EFS's Allegations of Copying by RUSS*

Based upon all of the evidence before the Court, the Court finds that defendants did not copy the idea of dressing troll dolls from plaintiff. Instead, the record suggests that defendants' development of the line of dressed troll dolls resulted from a combination of the success of the pencil topper trolls in 1987, Mr. Berrie's experience in the toy industry and with troll dolls dating back to 1961, and defendants' history of marketing "families" of doll toys dressed in the same types of outfits that were eventually placed on RUSS's trolls.

## CONCLUSIONS OF LAW

The complaint sets forth four causes of action against defendants. Plaintiff alleges separate violations of Section 43(a) of the Lanham Act, *see* 15 U.S.C. § 1125(a), in its First and Third causes of action: the infringement upon plaintiff's trade dress and the use of a copyright notice on products that they knew were not originals, respectively. *See* Complaint ¶¶ 24, 32–22. Plaintiff's Second and Fourth causes of actions assert, respectively, the state law claims of unfair competition and violation of the New York Consumer Protection Act, N.Y.Gen.Bus.L. § 349. *See* Complaint ¶¶ 27–28, 35. Finally, plaintiff claims that defendant Russell Berrie is personally liable for defendant corporation's alleged actions because he personally authorized the alleged infringements. Plaintiff has the burden of establishing its claims by a fair preponderance of the evidence. The Court shall first address the Lanham Act claims.

### A. *The Lanham Act Claims*

#### 1. *Plaintiff's Third Cause of Action: Improper Use of Copyright Notice*

■ In its third cause of action, plaintiff argues that defendants failed to satisfy the originality requirement of the Copyright Act and thus their use of a copyright notice was a misrepresentation of originality. According to plaintiff, such mismarking is a violation of

and therefore other companies could legitimately market and sell the Dam troll doll despite this agreement.

Section 43(a)(2) of the Lanham Act as false advertising. As a threshold issue, the Court notes that plaintiff has standing to bring this action, as Section 43(a) gives standing to "any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. 1125(a). Plaintiff may have suffered injury if the alleged mismarking of defendants' trolls falsely enhanced defendants' trolls as originals. *See Sunset Lamp Corp. v. Alsy Corp.*, 698 F.Supp. 1146, 1153 (S.D.N.Y.1988); *see also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 37 (2d Cir.1982) ("Section 43(a) reaches false and misleading claims with respect to defendant's own product, as distinguished from false claims about the plaintiff's product or other matters.").

The Copyright Act accords protection only to "original works of authorship." 17 U.S.C. § 102(a). Courts should invalidate registrations for copyright notice that are obtained without meeting this originality requirement. *See, e.g., L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.) (*en banc*) (upholding preliminary injunction compelling appellants to cancel recordation of a copyright for plastic Uncle Sam toy banks), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976). Such invalid registrations are *per se* violations of Section 43(a) of the Lanham Act. *See Eden Toys*, 697 F.2d at 37; *Sunset Lamp*, 698 F.Supp. at 1153.

■ Derivative works, which are based upon pre-existing works, require substantial originality in order to satisfy the Copyright Act's originality requirement. *See Weissmann v. Freeman*, 868 F.2d 1313, 1321 (2d Cir.), *cert. denied*, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *Eden Toys*, 697 F.2d at 34. Minuscule variations of otherwise pre-existing craftsmanship that are imperceptible to the casual observer are insufficient to obtain copyright protection. *See L. Batlin*, 536 F.2d at 489.

■ There is no dispute that defendants'—as well as plaintiff's—line of troll dolls is, at the very least, a derivative work from the original Dam troll doll. Defendants admit that they developed their line of troll dolls from the public domain doll, but claim that they have altered the original Dam troll

design sufficiently to entitle their design to copyright protection. They have obtained copyright registrations, which are entitled to weight as "*prima facie* evidence of the validity of the copyright" in question in judicial proceedings. *See* 17 U.S.C. § 410(c). Nevertheless, this presumption is rebuttable. *See Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980). Having reviewed the original Dam troll and various RUSS trolls, the Court finds that this presumption is in fact rebutted: the changes that defendants have made to the original Dam troll are simply too imperceptible to the casual observer to justify copyright protection. Defendants' alterations are merely minuscule variations that fail to alter the design of the public domain doll in any significant way. Therefore, defendants are enjoined from placing copyright marks on their troll dolls.

Similarly, however, plaintiff is also enjoined from affixing copyright notices to its trolls. Throughout these proceedings, the Court has reviewed dozens of both plaintiff's and defendants' troll dolls, and has found both parties' dolls to be virtually indistinguishable from the 1961 public domain doll. Therefore, because plaintiff's troll dolls similarly lack sufficient originality to justify copyright protection, it, too, is enjoined from placing copyright marks on its troll dolls.

The Court's finding is essentially harmonious with that of the Intellectual Property Branch of the United States Customs Service. In a recent decision, the Customs office reversed its decision of August 18, 1992 to ignore entirely copyright registrations for defendants' troll dolls. (*See* Department of Treasury, U.S. Customs Service's Legal Opinion re Russ Berrie's Request for Reconsideration, dated Aug. 23, 1993) at 9. It did, however, find that the "substantially similar" features of troll dolls in general compelled it to provide only the most limited protection to registered troll dolls—protection only against imported troll dolls that are "practically identical" to the troll dolls covered by a registration. *See id.* Such limited enforcement recognizes the tenuous nature of the copyrights now invalidated by this Court.

■ As for damages arising from the parties' mismarking, granting such a remedy would be inappropriate in this case. Even though both parties used copyright marks that the Court now finds invalid, only plaintiff seeks damages for defendants' use of these marks. This claim fails, however, because plaintiff has not shown that it was actually damaged by defendants' use of the copyright mark. There is insufficient evidence that the public identifies the RUSS troll doll as the original doll due to the copyright mark and that plaintiff has lost business because of this mark. Plaintiff itself implicitly admits that consumers would have a difficult time ever finding RUSS's copyright mark when it admits in its "Counter 3(g) Statement" that the "RUSS" trademark, which is next to, and much larger than, the "©" sign, is "placed in an obscure position on the bottom of one foot of each doll in a size that is difficult to read." Plaintiff's Counter 3(g) Statement (Jan. 19, 1993) ¶¶ 15–16, at 10. It is difficult to conceive how such a tiny mark placed in such an obscure position would ever influence consumers to purchase the product upon which the mark appears.

■ The Court is aware that proof of actual consumer confusion is unnecessary when defendants' conduct is intentionally deceptive or patently fraudulent. *See Resource Developers, Inc. v. Statue of Liberty—Ellis Island Found.*, 926 F.2d 134, 140 (2d Cir.1991); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272–73 (2d Cir.1987). Such egregious conduct, however, is not evident here. Both parties use copyright notices on their troll dolls and have vociferously advocated throughout the proceedings that their product was sufficiently original to justify copyright protection. Although the Court disagrees with the parties' arguments concerning the originality of their troll dolls, it finds that the parties sought copyright protection in good faith. This is not the type of conduct that the Second Circuit sought to reprove in *PPX Enters.*, in which the defendant had marketed eight albums purporting to contain feature performances by Jimi Hendrix, but which either did not contain Hendrix performances at all or contained performances in which Hendrix was merely a background performer or undifferentiated session player. *See PPX Enters.*, 818 F.2d at 268.

### 2. *Plaintiff's First Cause of Action: Infringement of Trade Dress*

#### a. *Section 43(a) of the Lanham Act and EFS's Trade Dress*

■ In its first cause of action, plaintiff alleges that defendants have violated Section 43(a)(1) of the Lanham Act by infringing its trade dress. "Unregistered trademarks and trade dresses are protectable under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides a private cause of action against any person who in 'connection with any goods … or any container for goods, uses in commerce any word, term, name, symbol, or device or any combination thereof … which is likely to cause confusion, or to cause mistake, or to deceive … as to the origin, sponsorship, or approval of his or her goods … by another person.'" *The Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 582 (2d Cir.1993) (quoting 15 U.S.C. § 1125(a)). The "trade dress" of a product "'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, [or] graphics.'" *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). Where plaintiff is the party claiming exclusive rights in a trade dress, it has the burden of proof with respect to the eligibility of its trade dress for such protection. *See PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir.1990).

Plaintiff asserts that the elements of its trade dress, which, in combination, create the overall look and the distinctive visual impression, include the sculptural elements of the doll, the proportion of the body to the head, the pot belly, the furrowed brow, the big eyes, the wild hair, the out-stretched arms, four-digit fingers, and the attention-getting clothing. *See* Record at 155; EFS 3(g) Statement (Nov. 30, 1992) ¶ 14. EFS further claims that it has established an entire "family" of dressed troll dolls that create the same

overall commercial impression while simultaneously providing an independent personality or character to each individual member of that family. *See id.* at 55–56, 152–53, 164.

**b.** *The* Two Pesos *Test for Trade Dress Infringement*

▮ In order to receive protection for a certain trade dress under Section 43(a) of the Lanham Act, plaintiff must show: (1) the trade dress is either inherently distinctive or has acquired distinctiveness through secondary meaning; and (2) the likelihood of confusion between defendants' trade dress and its own. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992); *Villeroy & Boch Keramische Werke K.G. v. THC Systems, Inc.,* 999 F.2d 619 (2d Cir.1993). Even if plaintiff meets these requirements, the alleged infringer can still prevail by showing that the similarities between the subject trade dresses are of a functional nature. *See LeSportsac,* 754 F.2d at 75–76. Because defendants have chosen not to contest the nonfunctional nature of plaintiff's trade dress, the Court will consider only the two initial requirements.

**i.** *Inherently Distinctive or Secondary Meaning*

. In general, trade marks are often "classified in categories of generally increasing distinctiveness; following the classic formulation set out by Judge Friendly, they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976)). In *The Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577 (2d Cir.1993), the Second Circuit explicitly held the *Abercrombie* classifications to be applicable to trade dress. *See id.* at 583–84.

▮ Plaintiff claims that its trade dress for its line of troll dolls is inherently distinctive. To be inherently distinctive, a trade dress must be either suggestive, arbitrary, or fanciful, such that its "intrinsic nature serves to identify a particular source of a product." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at

2757. For instance, in *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695, 702 (5th Cir.1981), a case involving the packaging and selling of 125 lawn and garden products in a uniform "family" trade dress, the Fifth Circuit held that a trade dress is inherently distinctive if its features are "arbitrary and serve no function either to describe the product or assist in its effective packaging." *Chevron,* 659 F.2d at 702. A trade dress that either refers to the genus of which the particular product is a species or that is merely descriptive does not qualify as being inherently distinctive. *See Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. In fact, generic marks are never protectable under the Lanham Act and descriptive marks must have acquired secondary meaning to become distinctive and thereby satisfy the first prong of the *Two Pesos* test. *See Two Pesos,* at ——————, 112 S.Ct. at 2757–58; *The Paddington Corp.,* at 583. Nevertheless, given that a court's analysis must focus on the "total impression that the dress gives to the observer," a trade dress may still be inherently distinctive despite its incorporation of.generic or descriptive elements. *The Paddington Corp.,* at 584.

Other factors that have been deemed helpful in determining inherent distinctiveness include:

> whether [plaintiff's trade dress] is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly adopted and well-known form of ornamentation for the particular class of goods viewed by the public as a dress or ornamentation for the goods.

*AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir.1986).

▮ Plaintiff's trade dress is not inherently distinctive. Most of the product features claimed by plaintiff to identify its Norfins—the pointed ears, puggish nose, pot belly, big eyes, proportion of the body to the head, furrowed brow, wild hair, out-stretched arms, and four-digit fingers, *see supra* at 133—have been elements of the public domain doll for 25 years. As for the remaining element of plaintiff's trade dress—the dis-

tinctive clothing—plaintiff admitted to copying this market concept of selling a group or family of dressed dolls from the Smurf line of children's dolls. *EFS I*, 1991 WL 275647 at 5, 1991 U.S.Dist. LEXIS 18203 at 11; Record at 55–56. Indeed, even defendant Russ had used the same concept before EFS on a host of other dolls. *See supra* at 131. Given the mere refinements that plaintiff has made to the public domain troll along with its adoption of a market concept commonly used in the field, this Court cannot find that the "intrinsic nature" of plaintiff's trade dress "serves to identify a particular source of a product." *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757; *AmBrit*, 812 F.2d at 1539.

### ii. *Likelihood of Confusion*

 Plaintiff has also failed to meet its burden of showing the likelihood of confusion. Determining the likelihood of confusion requires a two-part approach. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004–05 (2d Cir.1983). First, the Court must first make factual determinations as to the many variables that may be material in assessing the likelihood of confusion. *See id.; American Int'l Group, Inc. v. London American Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir.1981); *Chevron*, 659 F.2d at 703. In *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (1961), the Second Circuit listed eight factors that the trier of fact should consider: (1) the strength of plaintiff's trade dress; (2) the degree of similarity between plaintiff's and the alleged infringer's trade dresses; (3) the proximity of the products; (4) the likelihood that plaintiff will bridge the gap; (5) actual confusion; (6) the alleged infringer's good faith in adopting his mark; (7) the quality of the alleged infringer's product; and (8) the sophistication of the buyers. After these factual determinations have been made, the Court must then determine how much weight to give each factor. This balancing of the factors is a legal question. *See Plus Products*, 722 F.2d at 1004–05; *Brown v. Quiniou*, 744 F.Supp. 463, 467 (S.D.N.Y.1990).

The strength of plaintiff's trade dress is questionable: the sculptural changes to the public domain doll can best be viewed as a mere refinement of the public domain doll's common basic design, while the use of the market concept of selling a group or family of dressed dolls is hardly unique or unusual to the field of character dolls or figurines. Any degree of similarity between the two products stems largely from the fact that both the Russ trolls and the Norfins trolls are slightly altered versions of the same Dam troll. In addition, there is little evidence of actual confusion between the two lines of trolls. Plaintiff's only evidence of possible confusion consists of a mere thirteen letters from consumers that are inconclusive at best. Other factors that weigh against a finding in plaintiff's favor include the good faith of defendants in the development of their troll line, discussed *supra* at 132, and the high quality of Russ's trolls, which was never really challenged. Upon reviewing these factors, the Court finds that there is no likelihood of confusion. Plaintiff's claim for trade dress infringement is therefore denied.

### B. *Plaintiff's State Law Claims: Violation of New York's Unfair Competition Law and Consumer Protection Act*

The alleged acts underlying plaintiff's state claims are the same as those supporting plaintiff's Lanham Act claims. Plaintiff's second cause of action, which alleges a violation of the New York common law of unfair competition, *see* Complaint ¶¶ 27–28, requires a showing of the likelihood of confusion. *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1048 (2d Cir.1992); *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 77 (E.D.N.Y.1993). Having already found no likelihood of confusion between the two lines of trolls, *see supra* at 135–136, plaintiff's second cause of action is dismissed.

 Plaintiff's fourth cause of action, arising under the New York Consumer Protection Act, N.Y.Gen.Bus.L. § 349, *see* Complaint ¶ 35, is designed to remedy deceptive trade practices. It was not originally designed to redress claims such as trade dress infringement. *See Jaret Int'l*, 826 F.Supp. at 78; *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 786 F.Supp. 182, 215 (E.D.N.Y.), *aff'd in part and rev'd in part on other*

*grounds,* 973 F.2d 1033 (2d Cir.1992). Federal courts have generally only applied Section 349 to Lanham Act cases that involve the sort of offenses to the public interest that would trigger the intervention of the Federal Trade Commission, such as an ingestible product that contains illegal substances. *See Bristol–Myers,* 786 F.Supp. at 215 (citing *Vitabiotics Ltd. v. Krupka,* 606 F.Supp. 779 (E.D.N.Y.1984)). No such issue of public interest is involved in this case. Therefore, Section 349 is inapplicable to the claims asserted in the present case, and plaintiff's fourth cause of action is also dismissed.

### C. *Defendant Russell Berrie's Personal Liability*

Plaintiff asserts that defendant Berrie is individually liable in this action. A corporate officer may be personally liable for the torts of unfair competition if the officer personally commits, authorizes, directs or participates in the tort. Because the Court has now dismissed plaintiff's unfair competition claim, plaintiff's assertion that Berrie is individually liable is mooted, as there are no remaining claims for which defendant Berrie can be personally liable.

### *CONCLUSION*

For the reasons set forth above, plaintiff and defendants are enjoined from placing copyright marks on their lines of trolls. The remainder of plaintiff's complaint is dismissed. The Court orders this case closed and removed from its active docket.

**SO ORDERED.**