**DAM THINGS FROM DENMARK,**

v.

**RUSS BERRIE & CO., INC.**

No. CIV.A. 01–4008(NHP).

United States District Court,
D. New Jersey.

Dec. 3, 2001.

Peter L. Skolnik, Lowenstein Sandler PC, Roseland, NJ, Robert L. Sherman, Romy Berk, Paul, Hastings, Janofsky & Walker LLP, New York City, for Plaintiff.

Trent S. Dickey, Sills Cummis Radin Tischman, Epstein & Gross PC, Newark, NJ, for Defendant.

POLITAN, District Judge.

This matter comes before the Court on an application for a preliminary injunction by Plaintiff, Dam Things from Denmark a/k/a Troll Company ApS ("Plaintiff" or "Dam"). Plaintiff brought this action by way of an Order to Show Cause filed on August 22, 2001. Plaintiff seeks to enjoin

Defendant, Russ Berrie & Company, Inc. ("Defendant" or "Russ") from infringing its copyrights, importing infringing troll dolls, continuing to represent itself as the "original" troll doll creator, and maintaining its copyright registrations. Oral argument was heard on October 29, 2001. In addition, the parties have submitted a plethora[1] of memoranda in connection with the present application. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

### STATEMENT OF FACTS

In 1957 and 1958, Thomas Dam, a citizen and resident of Denmark, created a sculpture from clay. He used this sculpture to form a plastic mold and, using the mold, created a doll made out of rubber. He called his creation a troll. *See* Pl.Ex. 1. Mr. Dam gave this troll to his daughter Lajla as a gift, however, people in Mr. Dam's small town of Gjol took notice. Realizing the public interest in his troll doll, Mr. Dam, with the help of family members, began to produce what he termed "Good Luck Troll" dolls in larger quantity for sale to the public. He produced these trolls in a small factory inside of the Dam family home.

Dam's troll designs were copyrighted in Denmark pursuant to Danish copyright law. The Good Luck Trolls were sold throughout Denmark, and sales quickly spread to Norway and Sweden by 1961. In that year, the material used to make the trolls was changed from rubber to PVC, a type of plastic. *See* Niels Dam Decl., ¶ 4, Ex. D. Also at that time, production of the Dam trolls began in the United Kingdom. *Id.* Moreover, the Dam trolls entered the United States market for sale

---

1. A total of nine briefs were filed by the two parties in this action, along with numerous certifications and/or declarations.

that year as well. *Id.* In 1962, Thomas Dam formed the company Dam Things Establishment which has been succeeded by Plaintiff company. *Id.*, ¶ 6.

In the early 1960's, Plaintiff obtained U.S. copyright registrations for its Good Luck Trolls which were being sold in the U.S. These copyright registrations were invalidated, however, as a result of a declaratory judgment action brought against Dam. *See Scandia House Enterprises, Inc. v. Dam Things Establishment*, 243 F.Supp. 450 (D.D.C.1965). Scandia House, a distributor of Dam's trolls at the time, sought a declaratory judgment from the D.C. district court that Dam's U.S. copyrights were invalid.

The *Scandia House* Court found that Dam's troll designs then in circulation in the U.S. were indeed invalid because Dam had failed to comply with a formality required by the copyright laws in effect at that time. *Id.* at 455. Specifically, Plaintiff's troll products failed to provide proper notice of its copyright. The word "Denmark" instead of the name "Dam" was imprinted on the foot of some of the troll dolls; this designation was held insufficient to provide proper notice. *Id.*

The D.C. district court thus declared Dam's troll dolls, sold in the U.S. in 1961 and 1962, to be in the U.S. public domain, and concluded that "[n]o copyright can subsist in Dolls in the public domain." *Id.* at 454–55.

In 1966, Thomas Dam assigned all of his copyrights in Good Luck Troll designs to his company Dam Things Establishment. Niels Dam Decl., ¶ 6.[2] Dam Things Establishment was succeeded by Thomas Dam

Design and Copyrights AG, which company was then merged into Troll Company ApS in 1993. After Thomas Dam's death in 1989, his children, Niels and Lajla Dam entered into an agreement which confirmed that Troll Company ApS held the exclusive rights to all Good Luck Troll designs. Niels Dam Decl., ¶¶ 7–8.

In 1964, prior to the *Scandia House* decision, Russell Berrie, currently the president of Defendant company, sold Dam troll dolls for a company called Royalty Design. *See* Berrie Cert., ¶ 4. Royalty Design imported Dam's trolls and sold them in the U.S. pursuant to a licensing agreement with Dam. In 1967, after Dam's trolls were declared to be in the public domain in the U.S., Russell Berrie left Royalty Design and began selling troll dolls (which he had purchased from Royalty Design) on his own. Berrie Cert., ¶ 5. In or about 1974, Russell Berrie, through his company Russ, purchased molds from Royalty Design and began to produce and sell troll dolls under the Defendant company's name. Over the years, Russ, along with other toy companies, has made troll dolls and sold them periodically in the U.S. market. Russ's trolls have always looked very similar to the original Dam trolls. There is no question that, at least until 1996, Russ was not violating U.S. copyright law by producing these trolls.

In 1996, pursuant to the Uruguay Round Agreements Act, Congress enacted 17 U.S.C. § 104A, which provides that owners of copyrights which were lost to the United States public domain because of a failure to comply with a formality in U.S. copyright law previously in effect, are entitled to restoration of lost copyrights in

---

**2.** It is unclear whether there exists a document memorializing this particular assignment of rights. *See* Oct. 24, 2001 Dickey Cert., Ex. C at 161, lines 10–25. In any event, this assignment of rights was confirmed by a later agreement indicating that the company,

Dam Things Establishment and/or its successor, owned all copyrights on the Dam Troll dolls. Defendant has not contested that Plaintiff here is the owner of the Danish copyrights.

certain instances.[3] § 104A is known as the restoration provision and generally provides "that where foreign works may have fallen into the public domain in the United States because of their failure to comply with U.S. statutory formalities (such as publication without notice), the copyright is automatically restored as of January 1, 1996." *Toho Co. Ltd. v. William Morrow & Co., Inc.*, 33 F.Supp.2d 1206, 1216 (C.D.Cal.1998); 17 U.S.C. § 104A(h)(6)(C)(i). § 104A(b) "awards ownership of a restored work to 'the author or initial rightholder of the work as determined by the law of the source country of the work.'" *Films By Jove, Inc. v. Berov*, 154 F.Supp.2d 432, 448 (E.D.N.Y. 2001). There are other requirements for restoration which will be discussed herein.

In the present action, Plaintiff claims that its copyrights which were lost to the public domain in or about 1965 were restored on January 1, 1996 pursuant to § 104A. Plaintiff further claims that Defendant infringes or is threatening to infringe its restored copyrights. Plaintiff relies on nineteen different models of Dam's Good Luck Troll designs.[4] *See* Compl., ¶ 13; Aug. 18, 2001 Ostergaard Decl., Ex. A.

## DISCUSSION

### Standard for Issuance of Preliminary Injunction

■ In determining whether to issue a preliminary injunction, courts generally must consider: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *Doe v. National Board of Medical Examiners*, 199 F.3d 146, 154 (3d Cir.1999) (*quoting American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (*en banc*)); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999).

■ "[T]he grant of injunctive relief is an extraordinary remedy ... which should be granted only in limited circumstances." *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988)(*citing United States v. City of Philadelphia*, 644 F.2d 187, 191 n. 1 (3d Cir.1980)); *see also Falter v. Veterans Admin.*, 632 F.Supp. 196, 201 (D.N.J. 1986)(quotes omitted)(stating that "[t]here is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction"). Furthermore, an injunction should issue only if the plaintiff produces evidence sufficient to convince the court that all four factors listed

---

3. The purpose of the Uruguay Round Agreements Act was, in part, to achieve compatibility of copyright laws in countries around the world. *See* 3 Nimmer on Copyright § 9A.01, at 9A–1 (2001). "Protection now subsists under U.S. law for all works published within the last seventy-five years almost anywhere in the world, so long as the original work was of qualifying foreign rather than U.S. origin. The motivation for this startling change in copyright policy is ultimately to benefit United States authors—the hope being that retroactive American protection of foreign works will induce foreign countries to afford retroactive protection to American works." *Id.* (citations omitted).

4. Plaintiff's briefs and supporting documentation seem to contend that these nineteen models, because of nearly identical traits, essentially constitute one original troll design which was created by Thomas Dam in the late 1950's. The Court will address this issue more fully herein.

above favor preliminary relief. *See Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 192 (3d Cir. 1990).

■ The primary purpose of a preliminary injunction is to preserve the *status quo. See Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1150 (3d Cir.1982). Moreover, a preliminary injunction may only be issued when there are no disputed issues of material fact. *See Apollo Technologies, Corp. v. Centrosphere Industrial Corp.,* 805 F.Supp. 1157, 1191 (D.N.J. 1992).

■ In copyright actions, courts employ the same four-part analysis described above, but if a plaintiff is able to first demonstrate a reasonable likelihood of success on the merits of its claim, irreparable harm is presumed, and a balancing of the parties' respective interests is unnecessary. *See Apple Computer, Inc.,* 714 F.2d at 1254.

## 1. REASONABLE PROBABILITY OF SUCCESS ON THE MERITS

For the Court to grant injunctive relief in the case at bar, Dam must make a preliminary showing that it is reasonably likely to prevail on the merits of its claim(s). To determine likelihood of success on the merits here, this Court must decide whether Plaintiff has made out a *prima facie* case of copyright restoration and copyright infringement. *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1254 (3d Cir.1983).

The Copyright Act specifically authorizes courts to grant injunctions in order to prevent or restrain copyright infringement. 17 U.S.C. § 502. To obtain a preliminary injunction, Plaintiff must demonstrate that its copyrights were restored

pursuant to § 104A and that Defendant infringes or is threatening to infringe those restored copyrights. § 504.

## A. Likelihood of Success on Plaintiff's § 104A Restoration Claim

■ As already noted, Plaintiff contends that its 1960's copyright registrations were automatically restored in 1996 pursuant to § 104A. Though not required to do so, Plaintiff filed for and received reinstated copyright registrations for its original troll designs.[5] The restoration provision provides, in relevant part, as follows:

(a) **Automatic protection and term.—**

(1) **Term.—**

(A) Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration.

(B) Any work in which copyright is restored under this section shall subsist for the remainder of the term of copyright that the work would have otherwise been granted in the United States if the work never entered the public domain in the United States.

·　　·　　·　　·　　·

(b) **Ownership of restored copyright.—**A restored work vests initially in the author or initial rightholder of the work as determined by the law of the source country of the work.

(c) **Filing of notice of intent to enforce restored copyright against reliance parties.—**On or after the date of restoration, any person who owns a copyright in a restored work or an exclusive right therein may file with the Copyright Office a notice of intent to enforce that person's copyright or exclu-

---

**5.** Notably, registration of a copyright is a prerequisite to bringing an infringement action.

*See Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 650 F.Supp. 838, 850 (D.Mass.1986).

sive right or may serve such a notice directly on a reliance party. Acceptance of a notice by the Copyright Office is effective as to any reliance parties but shall not create a presumption of the validity of any of the facts stated therein. Service on a reliance party is effective as to that reliance party and any other reliance parties with actual knowledge of such service and of the contents of that notice.

17 U.S.C. § 104A (West 2001).

### Loss Due to Formality

§ 104A works to restore copyrights which were lost to the public domain because of the owner's earlier failure to comply with a formality of copyright law, such as notice. *See* § 104A(h)(6)(C)(i); *Toho Co. Ltd.*, 33 F.Supp.2d at 1216. "Prior to successive improvements to U.S. law, such formal stumbling blocks as notice and renewal threatened to doom the American copyrights of the unwary, including those belonging to foreign proprietors." 3 Nimmer on Copyright § 9A.02[A][2], at 9A–10. Here, it is specifically because Plaintiff failed to provide the proper notice of its copyrights that they were lost to the U.S. public domain. *See Scandia House*, 243 F.Supp. at 455.[6] Defendant argues that it was not a failure to comply with a formality which stripped Plaintiff of its U.S. copyrights, but rather there was a substantive reason why Plaintiff lost its copyrights. Defendant contends that because Plaintiff obtained a design patent in 1961 on its girl

version troll doll, it was precluded from obtaining a valid copyright on that same doll. Additionally, Defendant asserts that because Plaintiff is now claiming that all of its trolls in this case are substantially similar, the design patent precludes valid U.S. copyrights in all of Dam's trolls. In essence, Defendant claims that Dam could have either chosen a design patent or a copyright on its troll doll, but not both.[7]

Taking the argument a step further, Defendant maintains that because Dam's trolls were not eligible, substantively, for copyright protection, they cannot be restored under § 104A. Put differently, Defendant argues that Plaintiff's copyright was not lost because of a failure to comply with a formality, but was instead lost to the public domain for substantive reasons, i.e., that it was never entitled to a copyright in that a design patent had already issued. *See* 9/21/01 Tr. of Hearing, at 8–13.

A review of case law interpreting the "election doctrine" reveals that most jurisdictions have rejected it.[8] Although the Supreme Court declined to formally answer the question in 1954 of whether a design patent precludes a copyright and vice versa, it recognized then that "[n]either the Copyright Statute nor any other says that because a thing is patentable it may not be copyrighted. We should not so hold." *Mazer v. Stein*, 347 U.S. 201, 217, 74 S.Ct. 460, 98 L.Ed. 630 (1954). The *Mazer* Court also highlighted the different

---

6. Notably, in 1989, U.S. copyright law changed to reflect that copyright notice was no longer required for one's copyright to be valid. 17 U.S.C. § 401(a); *Cordon Art B.V. v. Walker*, 1996 WL 672969, *6 (S.D.Cal. Aug. 19, 1996).

7. Defendant relies, in part, on a 1936 case of *Jones Bros. Co. v. Underkoffler*, 16 F.Supp. 729, 731 (M.D.Pa.1936).

8. Moreover, there is a district court case which held, in no uncertain terms, that Dam's trolls were not copyrightable because of failure to provide proper notice of its copyright. *Scandia House*, 243 F.Supp. at 455. It is well-recognized that failure to provide notice is exactly the type of formality that § 104A contemplates. *See Toho Ltd.*, 33 F.Supp.2d at 1216; 3 Nimmer on Copyright § 9A.01, at 9A–10.

type of protection afforded by copyright and design patent. *Id.* at 218, 74 S.Ct. 460.

The 1936 case relied upon by Defendant here has been called into doubt by our courts. The United States Court of Customs and Patent Appeals specifically held that a work of art is entitled to protection by both a copyright and a design patent. *In re Yardley,* 493 F.2d 1389, 1393 (Cust. & Pat.App.1974). Relying on *Mazer,* the court held that "Congress has not provided that an author-inventor must elect between securing a copyright or securing a design patent. Therefore, we conclude that it would be contrary to the intent of Congress to hold that an author-inventor must elect between the two available modes of securing exclusive rights." *Id.; see also Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476–78, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974)(remarking on the different type of protection afforded by patent as compared with copyright).

In 1995, the Copyright Office issued a policy statement with respect to the election doctrine. *See* 60 F.R. 15605. The Copyright Office opined, also citing *Mazer v. Stein,* that there is no legal justification for the election doctrine. The 1995 statement stresses that "if a work otherwise meets the requirements of copyrightability it should not be denied such simply because the claimant happens to be entitled to supplementary protection under other legislation." *Id.*

■ It is therefore clear that design patent and copyright protect different aspects of a work. This Court is convinced that the election doctrine, with respect to copyright and design patent, is not good law now and doubts whether it ever actually was. As a result, Defendant's argument that Plaintiff's copyrights are not entitled to restoration on this basis fails.

### Danish Copyright Validity

A "restored work" is defined in the statute as "an original work of authorship that ... is not in the public domain in its source country ... [but] is in the public domain in the United States." 17 U.S.C. § 104A(h)(6); *Hoepker v. Kruger,* 2001 WL 987937, *2 (S.D.N.Y. Aug. 28, 2001). Specifically, the work sought to be restored must not be in the public domain in the source country due to expiration. *See* § 104A(h)(6)(B).

■ Here, the Danish copyrights on Dam's trolls have not expired, and Dam's trolls are not otherwise in the public domain in Denmark. Defendant argues otherwise. Defendant asserts that Dam's Danish copyrights may not be valid, as it believes that decisions of Danish courts construing Danish copyright law are not "competent" evidence of validity. A number of Danish courts have upheld the validity of Dam's copyrights in its Good Luck Trolls. *See* Niels Dam Decl., Ex. C. Though Defendant is skeptical, this Court will not second guess a Danish court's interpretation of Danish copyright law. Instead, the Court is convinced that those decisions are sufficient to establish the validity of Plaintiff's Danish copyrights for § 104A purposes. Plaintiff has demonstrated that the copyrights at issue here have not been lost to the public domain in the relevant source country. Accordingly, Plaintiff also meets this particular requirement of restoration.

### National of Eligible Country

The author/creator of a work sought to be restored must have been a national of an eligible country when he or she created the work in question. *See* § 104A(h)(6)(D). It is not disputed that Thomas Dam was a national of Denmark. Nor is it disputed that Denmark is an

"eligible country." An eligible country is one which is either a signatory to the Berne Convention or a member of the World Trade Organization. 17 U.S.C. § 104A(h)(3). Denmark is both a Berne Convention signatory and a member of the World Trade Organization.

### Reliance Party Status/Notice of Intent to Enforce

Plaintiff claims, assuming that Russ was a reliance party [9], that it served Russ with a notice of intent to enforce ("NIE") its restored copyrights on November 16, 1996. *See* Aug. 18, 2001 Ostergaard Decl., Ex. K. Plaintiff provided the Court with a copy of that NIE which was signed by Jeppe Dam, the managing director of Plaintiff company at that time. Defendant denies receipt of this NIE, and otherwise argues that it was defective.

On February 13, 2001, Plaintiff served Defendant with an NIE. Defendant acknowledges receipt of this one. Obviously, the parties dispute the question of when Russ actually received a valid NIE. For purposes of this preliminary injunction motion, however, resolution of this dispute is not necessary and does not bear upon whether an injunction may issue at this time.

Should the Court find a likelihood of infringement, it may enter a preliminary injunction to prevent further manufacturing of infringing dolls, while still allowing Defendant to sell off its existing inventory.[10] Assuming, for purposes of this motion, that Defendant only received an NIE from Plaintiff on or about February 13, 2001, Defendant would have until February 13, 2002 to sell off *existing* inventory. This dispute does not impact the Court's decision of whether a preliminary injunction is proper now. Resolution of this dispute will therefore be reserved, if necessary, for a final hearing or for trial.

### Publication in Source Country

§ 104A dictates that the work sought to be restored must first have been published in the source country. Defendant maintains that Plaintiff first published its trolls in the U.S., and, therefore, Plaintiff's lost copyrights are not entitled to restoration. A cursory review of the record reveals that this assertion is entirely unsupported. Evidence in the record demonstrates publication in Denmark in the late 1950's and at least thirty days prior to publication in the U.S., which occurred in 1961. *See* Oct. 27, 2001 Ostergaard Decl., Ex. E; Niels Dam Reply Decl., ¶¶ 5–7, Exs. A–C. Accordingly, this defense to restoration also fails.[11]

9. A reliance party is an entity who "engages in acts [before 1996] which would have violated [the author's rights] if the restored work had been subject to copyright protection, and who after [1996] continues to engage in such acts ..." 17 U.S.C. § 104A(h)(4). Because Dam's Good Luck trolls were in the public domain when Russ "created" its trolls, Russ indeed may have been a reliance party. The Court, however, makes no final determination on this issue today, but assumes for purposes of this motion that Russ qualifies as a reliance party under § 104A.

10. Though none of the nine briefs filed touch on this point, § 104A(d)(2) provides that courts may enforce copyrights in restored works against reliance parties and provide all

remedies available in Chapter 5, including injunctions, if certain requirements are met. *See* § 104A(d)(2). "A reliance party is subject to infringement remedies only 'with respect to any act of infringement of a restored copyright, on or after the date of restoration,' and only if the plaintiff serves on the alleged infringer or files with the Copyright Office a 'notice of intent to enforce the restored copyright' using the procedures described in the statute." *Hoepker v. Kruger*, 2001 WL 987937 (S.D.N.Y. Aug. 28, 2001).

11. Defendant also asserts an unclean hands defense on the basis that Plaintiff misrepresented material information to the Copyright Office, namely where first publication occurred. *See* § 104A(e)(2)(B). As stated be-

### 1965 Thomas Dam Affidavit

Defendant further argues that a 1965 affidavit of Thomas Dam precludes this Court, under a theory of judicial estoppel, from finding that Dam is entitled to valid U.S. copyrights on its trolls.[12] Defendant contends that because Thomas Dam made a sworn statement in 1965 indicating that his 1961 girl troll was an original expression of a troll, it (and other Dam versions) cannot be protected by copyrights which protected Dam's earlier trolls. The Court is not persuaded by this argument. Thomas Dam was an artist. He designed the Original Good Luck Troll, and extrapolated on that design to create new versions. In his 1965 affidavit, he stated that the girl troll doll produced in 1961 was "vastly different artistically" from his earlier troll designs, indicating that the earlier dolls had "high pointed ears, bulbous nose, twisted jaw, tail and ... open, twisted mouth." Ex. T., ¶ 1. Dam testified that he believed the girl troll design was unobvious, a requirement for procurement of a design patent. *See* Niels Dam Reply Decl., ¶ 13, Ex. I.

But simply because Thomas Dam perceived his 1961 girl troll as distinct from his earlier troll designs does not render it sufficiently distinct for copyright purposes. Copyright law requires more than trivial variations in order for a design to be original and copyrightable. *Alfred*

Bell & Co., 191 F.2d 99. The Third Circuit has indicated that in determining whether two works are substantially similar, the determination should be made from a lay observer's point of view. *Ford Motor Co. v. Summit Motor Prods., Inc.* 930 F.2d 277, 291 (3d Cir.1991); *Whelan Assocs., Inc. v. Jaslow Dental Laboratory,* 797 F.2d 1222, 1232 (3d Cir.1986).[13]

Additionally, Defendant relies on an affidavit by Steven Stark filed in the *EFS Marketing Inc. v. Russ Berrie & Co. Inc.,* case for the proposition that Dam therein made a statement against interest. *See* Sept. 10, 2001 Dickey Cert., Ex. F. The Court has reviewed that affidavit, and finds that, contrary to Defendant's contentions, the affidavit tends to support Dam's position here, namely that Thomas Dam was the original creator of the troll dolls at issue in this case, and that Dam lost its copyrights in the U.S. due to a "technical imperfection." *See id.,* Ex. F, ¶¶ 6,8.

### Abandonment

The Court also rejects Russ's defense of abandonment, where Russ claims that Plaintiff has abandoned its troll designs in the U.S. and therefore is not entitled to restoration. Defendant has failed to demonstrate that Plaintiff intentionally surrendered its rights. *See Pacific & Southern Co., Inc. v. Duncan,* 572 F.Supp. 1186, 1196 (N.D.Ga.1983). Instead, it is clear that because Dam's copyrights were previ-

---

fore, evidence in this record supports publication in Denmark prior to 1961. The unclean hands defense is thus meritless.

12. Defendant also argues that the Dam troll dolls sold in the U.S. from 1961 to 1964, the copyrights of which were invalidated by the *Scandia House* decision, are different from the 1957/1958 copyrighted troll designs. The Court is not so convinced. As will be made clear herein, this Court believes that all nineteen versions of Dam's trolls involved in this case fall under one original design.

13. The Third Circuit actually breaks down the determination of substantial similarity into two tests, the extrinsic test and the intrinsic test. *See id.* With the extrinsic test, courts often use expert testimony and a visual comparison to determine whether the defendant used the plaintiff's copyrighted material in making the alleged infringing design. *See id.* The intrinsic test of substantial similarity "is whether, from a lay perspective, the copying was an unlawful appropriation of the copyrighted work." *Id.; citing Whelan Assocs.,* 797 F.2d at 1232.

ously part of the U.S. public domain, Dam had no legitimate basis for pursuing copyright actions against copiers in the U.S.

▮ Additionally, Defendant's argument that Plaintiff should have appealed the *Scandia House* decision, and that failure to do constituted abandonment, is preposterous. It would have been reasonable for Dam or its counsel to presume that Dam would not have prevailed on appeal, given the clear law at that time requiring notice. Thus, failure to appeal shows not an abandonment of rights, but perhaps a surrender to the formalities of the copyright law then in effect.

Defendant has contested restoration for a myriad of reasons, but cannot circumvent the clear language of § 104A. Here, the Original Good Luck Troll was first published in Denmark in the late 1950's, and it was lost to the U.S. public domain in 1965 for failure to provide proper notice. The Court is convinced that Plaintiff can prove all of the requisite elements of § 104A and is therefore likely to succeed on the merits of its restoration claim.

### B. Likelihood of Success on Copyright Infringement Claim

▮ § 104(a)(1)(B) indicates that a restored work enjoys copyright protection of the same duration as if it never entered the public domain. Therefore, because Dam's copyrights on its trolls were restored in January 1996, they are currently

in effect. To make out a claim for copyright infringement under § 504, a plaintiff must demonstrate (1) ownership of a valid copyright, and (2) infringement or the threat of infringement on that copyright by the defendant. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 290 (3d Cir.1991); *Whelan Assocs., Inc. v. Jaslow Dental Laboratory*, 797 F.2d 1222, 1231 (3d Cir. 1986).

▮ The Court has already found that restoration here is likely. Moreover, it is well-settled that certificates of registration are *prima facie* evidence of copyright validity and ownership. *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F.Supp. 1228 (D.N.J.1992).[14] Plaintiff has obtained registrations for its restored copyrights which are to be presumed valid. To be successful in its claim, Plaintiff must demonstrate that Russ either infringes its copyright or is threatening to do so. A plaintiff may prove copyright infringement by showing either direct copying or access to a plaintiff's work and substantial similarity between plaintiff's and defendant's work. *See Value Group, Inc.*, 800 F.Supp. at 1234.

Plaintiff asserts that Russ directly copied its designs, using molds identical or virtually identical to Dam's, and then pro-

---

**14.** Of course, Russ also has copyrights on a number of troll dolls. Therefore, the question arises of whether Russ's copyrights are valid. They too are entitled to the presumption of validity. Plaintiff can rebut Defendant's *prima facie* showing of validity by producing evidence that Defendant directly copied its or another's designs. *See Russ Berrie & Co., Inc. v. Jerry Elsner Co.*, 482 F.Supp. 980, 987 (S.D.N.Y.1980); *Midway Mfg. Co. v. Bandai–Amer., Inc.*, 546 F.Supp. 125, 139–40 (D.N.J. 1982).

Plaintiff claims that Russ made misrepresentations to the Copyright Office in 1991 when it sought and obtained registrations on troll doll designs. *See* Aug. 18, 2001 Ostergaard Decl., ¶ 9, Ex. E. The Court need not determine today whether in fact Defendant's copyrights are invalid, only that Plaintiff is likely to prove that Defendant copied its designs. The Court so finds herein.

duced larger versions of pencil topper trolls. Pl. Br. at 11. Plaintiff also argues that Defendant had access to Plaintiff's troll designs and that Russ's trolls are substantially similar to Dam's. Plaintiff bolsters these arguments by citation to cases previously decided by this and other district courts. *See* Ostergaard Decl., Ex. C; *Russ Berrie & Co., Inc. v. Ace Novelty Co., Inc.*, Civil Action No. 92–468(NHP); *EFS Marketing, Inc. v. Russ Berrie & Co., Inc.*, 836 F.Supp. 128, 133 (S.D.N.Y.1993), *rev'd on other grounds*, 76 F.3d 487 (2d Cir.1996). The *EFS Marketing* Court opined that Russ's trolls were substantially similar to Plaintiff's troll designs, stating that Russ's changes to the Dam trolls were "too imperceptible to the casual observer to justify copyright protection." *EFS Marketing, Inc.*, 836 F.Supp. at 133.

Russ's access to Dam's troll designs is not contested. Indeed, the president of Russ admits that he previously sold Dam trolls for another company before forming Defendant company. Moreover, the designs were in the public domain in the United States after the 1965 *Scandia House* decision until restoration in 1996. Russell Berrie, has acknowledged that Dam was the initial designer of the troll dolls and stated that he began selling Defendant's trolls in 1967. *See* Berrie Cert., ¶ 5; Aug. 18, 2001 Ostergaard Decl., Ex. 3. Mr. Berrie has also indicated that Russ's trolls, from 1975 to 1979, "had an appearance similar to the Dam Things trolls sold in the 1960's," Aug. 18, 2001 Ostergaard Decl., Ex. G., ¶¶ 7–8, and that in 1982, Russ "reintroduced the 3" troll figurines, previously referred to as 'Good Luck Trolls,' and continued to sell them as the "Original 'Good Luck Troll' through late 1984." *Id.*

Defendant argues that the registrations obtained by Plaintiff cover only the early Dam troll designs, not later versions, and

that a preliminary injunction here would effectively give Plaintiff a monopoly on the idea of troll, or on what Defendant has termed "trolldom." Defendant asserts that copyright law is designed to protect the expression of an idea, not the idea itself. *See Mechanical Plastics Corp. v. Titan Tech. Inc.*, 823 F.Supp. 1137, 1142 (S.D.N.Y.1993)(indicating in a patent case that "Congress has authorized the protection of the embodiment of an idea, the expression of an idea, a process, a design, or a product.").

■ Our Copyright Act is meant "[t]o promote the Progress of Science and useful Arts." *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349–350, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Moreover, the Supreme Court has held that our copyright laws assure creators the right to their original creation or expression, while at the same time allow others to "build freely upon the ideas and information conveyed by a work." *Id.* It is well-settled that an individual who translates an idea into a "fixed, tangible expression" is entitled to copyright protection for that expression of the idea. 17 U.S.C. § 102; *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). This Court recognizes, as it must, that an idea itself is not entitled to copyright protection. But this Court also recognizes that Plaintiff does not seek to prevent others from designing original troll dolls. It seeks only to prevent others from profiting from its original creation.

■ The Court has carefully examined the dueling trolls at issue here, and is convinced that Plaintiff has made a *prima facie* showing of infringement. A finder of fact who compares Russ's trolls with Dam's could not reasonably conclude that the Russ's trolls are original designs or that they comprise original expression of

the idea of a troll. In the present case, all of the troll embodiments involved are very similar in appearance. This Court believes that, for purposes of copyright law, the designs are too similar to be given individual copyright protection. Contrary to Defendant's contention, Plaintiff's do not claim a copyright on the idea of a troll or a monopoly on trolldom. Nor are they entitled to it. But Plaintiff is entitled to protect its particular, original, identifiable expression of troll.[15]

Russ argues that it has modified Dam's designs by changing the size of the heads, changing the facial expressions, and changing the shape and size of the dolls' bodies, and that these changes are sufficient to constitute original designs. Def. Surreply Br. at 18. Simply because one troll's nose is larger or one's ears are slightly more pointed, or that a troll's mouth is opened or closed, in this Court's view, does not make these designs sufficiently distinct so as to be afforded independent copyright protection.

Defendant further highlights the distinction between Thomas Dam's very first troll creation, which was made out of rubber, and the subsequent troll dolls which were made from PVC plastic. This distinction does not change Dam's idea of the troll doll. The rubber trolls and the trolls made with PVC are still the same basic embodiment of Thomas Dam's Good Luck Troll. Some dolls have orange hair, and some have no hair at all. But these variations do not necessarily make the individual dolls original expressions of trolls.

Different expressions of trolls could exist and be simultaneously protected, assuming those expressions of "troll" are original. One certainly can imagine a different embodiment of a troll doll which would not infringe upon Plaintiff's basic troll design. In fact, Exhibits K and L to the October 1, 2001 Ostergaard Declaration contain such examples.

Exhibit K is "A Collectors Guide to Trolls," and it contains objects and/or wooden dolls which are referred to as trolls. These trolls are sufficiently distinct from Dam's troll design, yet they exist in the so-called universe of "trolldom." Exhibit L is a printed page from a website entitled "Trolls from Trolldom." It contains depictions of troll dolls which are also distinguishable from the trolls involved in the case at bar. See Oct. 1, 2001 Ostergaard Decl, Exs. K, L.

In further defense of its trolls, Russ maintains that only minimal or slight creativity need be demonstrated in order for a work to be original. See Feist Publications, Inc., 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358. But as Defendant also points out, "something more than a 'merely trivial variation,' something recognizably 'his own'" is necessary for a showing of originality. Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2d Cir.1951). Here, the Court believes that Russ's trolls contain only trivial variations from Dam's original troll, and therefore are not sufficiently original. For example, comparing Defense Exhibit Four to Plaintiff's Exhibit Two, it is apparent that these two troll dolls have different hair color. Dam's troll has brown hair and Russ's troll has bright pink hair. The ears on the Dam troll doll appear slightly larger than the ears on the Russ troll doll. Otherwise, there are no discernable differences between the two dolls. They both have the same belly-button and coloration. Their facial characteristics are nearly identical, and they both

---

**15.** Of course, the Court is cognizant that Plaintiff has obtained several copyright registrations for its various troll doll versions. In this Court's opinion, the Dam trolls involved in this case should be protected under one copyright.

have four fingers, four toes, appear in the same stance, and carry the same protruding belly.

Comparing Defendant's Exhibit Five to Plaintiff's Exhibit Ten, the Court perceives another nearly identical expression of a troll. The trolls depicted are smaller, three inch versions of the doll. The ears on Russ's troll doll are slightly higher than the ears on the Dam troll, and the Russ troll doll's hair is pushed up off of the doll's face whereas the Dam troll's hair falls more loosely around the face. The doll's are adorned with slightly different clothing. Otherwise, they are substantially similar in appearance, and a casual observer would be unable to differentiate the maker of these troll dolls.

As the foregoing analysis makes clear, this Court is convinced that all of the dolls in this case involve one basic troll design; Thomas Dam created this design in 1957 and 1958 in Gjol, Denmark. His company owns the rights to it, and it is entitled to copyright protection for the original design.[16]

As a result, Plaintiff has satisfied this Court that it is likely to succeed on the merits of its copyright infringement claim against Russ.

### 2. IRREPARABLE HARM

 A plaintiff seeking a preliminary injunction must usually show that it is likely to experience irreparable harm without an injunction. *See Crowe v. DeGioia*, 90 N.J. 126, 132, 447 A.2d 173 (1982); *see also Sherman v. Sherman*, 330 N.J.Super. 638, 750 A.2d 229 (1999). "Harm is generally considered irreparable in equity if it cannot be redressed adequately by

monetary damages." *Crowe*, 90 N.J. at 132, 447 A.2d 173. In deciding whether injunctive relief is appropriate, the degree of irreparable harm to each party must also typically be balanced. Generally "[u]nless the hardship to plaintiff if the injunction does not issue greatly outweighs the harm to defendant if it does, the injunction should not issue." *J.H. Renarde, Inc. v. Sims*, 312 N.J.Super. 195, 204–05, 711 A.2d 410 (1998).

Plaintiff here, however, need not demonstrate irreparable harm because it has demonstrated a likelihood of success on the merits of its restoration claim and its copyright infringement action against Russ. *See Marco v. Accent Publishing Co., Inc.*, 969 F.2d 1547, 1553 (3d Cir.1992) (indicating that a showing of likelihood of success in a copyright infringement action raises a rebuttable presumption of irreparable harm). Once a plaintiff in a copyright infringement action has demonstrated a *prima facie* case of infringement, irreparable harm is presumed and need not be shown. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984); *Value Group, Inc. v. Mendham Lake Estates*, 800 F.Supp. 1228, 1233–34 (D.N.J.1992). Defendant has not rebutted this presumption.

Moreover, a balancing of the hardships need not be conducted when the plaintiff has already shown a likelihood of success on the merits of a copyright infringement action. *Apple Computer, Inc.*, 714 F.2d at 1254,; *accord Toho Co. Ltd.*, 33 F.Supp.2d 1206, 1210 (S.D.Cal.1998).

---

16. *See, e.g., Toho Co. Ltd.*, 33 F.Supp.2d at 1215. The *Toho* Court found that where a character, in that case "Godzilla," has an "identifiable set of traits that had developed over the course" of sixteen films, and because those traits maintained an "underlying set of [well-defined] attributes" distinguishing it from other characters, the character itself was copyrightable in and of itself, apart from the Godzilla films. *Id.*

Nevertheless, Plaintiff argues that it will suffer irreparable harm if a preliminary injunction is not granted. Plaintiff contends that the alleged copying would jeopardize its investment in the troll product and its competitive position in the market, and that this will cause the relatively small company irreparable harm. Plaintiff further contends that allowing Defendant to continue producing and selling its troll dolls "would place plaintiff in the intolerable position of having to compete with its own proprietary design being marketed by a much larger competitor, would spoil plaintiff's current licensing arrangements and would virtually destroy plaintiff's ability to license or engage in any other form of strategic alliance in the future." Pl. Br. at 17.

As stressed by this Court in *Value Group*, "[i]t would be a grave injustice to permit a competitor to profit from another competitor's hard work and injure that competitor simultaneously. The jeopardy to investment and competitive position caused by the copying satisfies the requirement of irreparable harm needed to support a preliminary injunction." *Value Group, Inc.* 800 F.Supp. at 1234. It would likewise be unjust in the case at bar to allow Russ Berrie to profit from Dam's original designs while at the same time causing Dam losses in the marketplace. The owner of an original design should not be forced to compete with infringing copies of its own design.

■ In copyright infringement cases, courts need not engage in the balancing of hardship analysis. *Value Group, Inc.,* 800 F.Supp. at 1234–35; *Apple Computer, Inc.,* 714 F.2d at 1255. "Allowing for a balancing of hardships would permit a knowing infringer to construct its entire business around infringement." *Id.* Thus, the equities need not be balanced here for a preliminary injunction to issue.

### 3. PUBLIC INTEREST

The Court must, however, also consider whether granting the preliminary relief sought by Plaintiff is in the public interest. *See Doe v. National Board of Medical Examiners,* 199 F.3d 146, 154 (3d Cir. 1999). Plaintiff asserts that it is in the public interest to grant a preliminary injunction at this stage because Congress intended the Copyright Act to protect creative works. Plaintiff argues that by allowing Defendant to continue selling its troll dolls, restoration under § 104A would be rendered meaningless.

■ Courts in this jurisdiction have held that the public interest is indeed served by allowing copyright owners to protect their work in accordance with our copyright laws. *Apple Computer, Inc.,* 714 F.2d at 1255; *Stenograph LLC v. Sims,* 2000 WL 964748 (E.D.Pa. July 18, 2000). Moreover, "preventing the pirating of creative energies and resources that are invested in protected works" has been found to be in the interest of the public. *Value Group, Inc.,* 800 F.Supp. at 1234; *see also Ballas v. Tedesco,* 41 F.Supp.2d 531, 541 (D.N.J.1999).

### Plaintiff's Additional Claims

Plaintiff's Complaint asserts additional claims and Plaintiff moves for a preliminary injunction based on these counts as well. These claims include copyright infringement under Chinese law, importation of piratical works under 17 U.S.C. § 602, false description, false representation, and false designation of origin pursuant to 15 U.S.C. § 1125(a)(1)(A), as well as common law and New Jersey statutory unfair competition claims. Plaintiff also claims that, pursuant to 37 C.F.R. § 201.7, Defendant's copyrights in troll dolls should be cancelled because of alleged misrepresentations to the Copyright Office.

At this juncture, and in light of the fact that a preliminary injunction will issue based on Plaintiff's infringement claim, the Court declines to address the probability of success of these additional claims at this juncture.

## CONCLUSION

Based on the foregoing analysis, the Court finds that Plaintiff has demonstrated a likelihood of success on its copyright infringement claim, inasmuch as it has demonstrated automatic restoration of its copyrights in the Good Luck Troll designs pursuant to § 104A and Defendant's likely infringement of those restored copyrights. Accordingly, issuance of a preliminary injunction is warranted. Plaintiff's application for a preliminary injunction will be granted.

## ORDER

**THIS MATTER** having come before the Court on Plaintiff's application for a preliminary injunction, and oral argument having been heard on October 29, 2001, and for the reasons articulated in the above opinion,

**IT IS** on this 3rd day of December, 2001,

**ORDERED** that Plaintiff's application for a preliminary injunction is **GRANTED**; and it is

**FURTHER ORDERED** that Defendant shall immediately cease the manufacture and sale of all troll dolls, other than selling those troll dolls currently in Defendant's existing inventory; and it is

**FURTHER ORDERED** that on February 13, 2002, and thereafter, Defendant shall cease all sales of its troll dolls involved in this litigation, unless otherwise agreed to by the parties.