**DAM THINGS FROM DENMARK,
a/k/a TROLL COMPANY ApS**

v.

**RUSS BERRIE & COMPANY,
INC., Appellant.**

No. 01–4422.

United States Court of Appeals,
Third Circuit.

Filed May 14, 2002.

Argued March 7, 2002.

Trent S. Dickey, James M. Hirschhorn, [argued], Sills, Cummis, Radin, Tischman, Epstein & Gross, Newark, NJ, for appellant.

Robert L. Sherman, Paul, Hastings, Janofsky & Walker, New York City, for appellee.

BEFORE: BECKER, Chief Judge, ALITO, and RENDELL, Circuit Judges.

OPINION OF THE COURT

RENDELL, Circuit Judge.

We consider this case on an expedited appeal from the United States District

Court for the District of New Jersey. The parties to this appeal, Dam Things from Denmark, a/k/a Troll Company ApS (together "Dam Things"), and Russ Berrie and Company, Inc. ("Russ"), are purveyors of trolls—short, pudgy, plastic dolls with big grins and wild hair. Dam Things, a Danish company, asserts that its copyright in its original troll design, the "Basic Good Luck Troll," has been restored pursuant to 17 U.S.C. § 104A. Section 104A is a highly unusual provision which has restored copyright protection in a vast number of foreign works previously in the public domain. Dam Things brought this action against Russ alleging infringement of its restored copyright.[1] If restoration is proper under the statute, the key remaining issues are whether there is infringement, and if so, whether the infringing works will be totally prohibited or will be entitled to mandatory licenses under § 104A's safe harbor for derivative works.

Upon application by Dam Things, the District Court granted a preliminary injunction forbidding Russ from selling any trolls after February 13, 2002.[2] In its opinion and order, the District Court explained that the preliminary injunction was warranted because in all likelihood Dam Things could establish that the copyright in the "Good Luck Troll designs" was restored under § 104A and that Dam Things could also prove that Russ infringed its restored copyright.

Russ attacks the District Court's grant of the preliminary injunction on two grounds. First, Russ argues that the Dam Things troll, P1, does not qualify for copyright restoration, in part because Dam Things abandoned its copyright. Second, Russ contends that even if restoration is

proper, the injunction was improvidently granted because the Russ trolls at least qualify for the safe harbor protection § 104A provides for derivative works.

We believe that the District Court properly determined that Dam Things was likely to establish that P1's copyright qualified for restoration and that this copyright was not abandoned by Dam Things. We find, however, that the District Court's subsequent analysis was flawed in two ways. First, the District Court conflated the tests for infringement and derivative works, and it therefore did not properly consider the possibility that any of the Russ trolls qualified for § 104A's safe harbor for derivative works. Second, the District Court did not conduct the proper comparison of each of the allegedly infringing Russ trolls against the restored Dam Things troll—P1. As we believe that the District Court based its grant of the injunction on an incomplete factual and legal analysis, we will vacate the injunction and remand for further consideration by the District Court in light of this opinion.

We note that the District Court's somewhat conclusory treatment of the issues, and trolls, may have been due to the parties' lack of clarity as to what troll designs were the subject of their arguments. Essentially, the parties label the trolls and group them as suits each party's interests. The parties' briefs accordingly ask us to rule in sweeping fashion as to the protection, or lack thereof, to be afforded to the various Russ and Dam Things trolls. The District Court's opinion adopts such a general approach in grouping all of the trolls together, referring to the Dam Things trolls generally as the "Good Luck Troll designs." The Court's reasoning, however,

---

1. Dam Things' complaint sets forth five other claims for relief which are not implicated in this appeal.

2. By agreement of the parties, and in light of this pending appeal, this date was extended to March 29, 2002.

was based on its determination that the copyright in the 1957/1958 "Original Good Luck Troll," P1, qualified for restoration. Furthermore, on appeal Dam Things has clearly stated that P1 is the only troll in which it seeks restoration. We note at the outset, therefore, that we will limit our analysis to the arguments pertaining to the restoration of P1.

## I.

In the 1950s, Thomas Dam, a Danish woodcarver, created a troll figure for his daughter out of rubber. He called it the "Good Luck Troll," claiming that it had the ability to bring good luck to whomever possessed it. Apparently, his creation garnered much attention from the community and Dam decided to sell trolls to the public. He first manufactured them in his home, and soon established a factory outside of his home for this purpose. An article from the Danish weekly magazine *Se & HQr* dated September 4, 1959, features a photograph of Thomas Dam's daughter holding the trolls and tells of the troll's rising popularity—amounting to sales of 10,000 trolls each month in Denmark alone. In 1961, the trolls began to be produced in PVC instead of rubber, increasing their durability. As the troll's success continued, Dam began selling his trolls in other countries. According to Dam Things, the Dam trolls were first sold in the United States in 1961.

In 1960, Thomas Dam applied for a United States design patent for a troll doll, and the patent was issued in 1961. This troll doll was later described by Thomas Dam as "girl-like" as opposed to the original "boy-like" troll, and certain photographs of the troll submitted with the application reflect that the troll has hair pulled back in a ponytail. Dam Things[3] filed applications for U.S. copyright registration of both the boy-like and girl-like trolls in 1964 and then again in 1965 after its initial applications were rejected for improperly designating the copyright holder as Denmark. Dam Things has held and continues to hold a valid Danish copyright in the trolls. *Dam Things from Denmark v. Russ Berrie & Co.*, 173 F.Supp.2d 277, 284 (D.N.J.2001). In 1965, the District Court for the District of Columbia held that the Dam Things' trolls submitted for patent and copyright protection were in the public domain, because they were published in the United States with improper notice—they were marked with "Denmark" and the date or with just the date, instead of with the company's name and date—or with no notice at all. *Scandia House Enters., Inc. v. Dam Things Establishment*, 243 F.Supp. 450, 453–54 (D.D.C. 1965) [hereinafter *Scandia*].

In the early 1950s, Russell Berrie was a manufacturer's representative for two companies who sold Dam Things trolls. Berrie started his own company, Russ Berrie and Company, Inc. in 1963 and began to sell trolls manufactured by Dam Things' U.S. licensee, Royalty Design, using the Dam Things molds, in 1967. When Royalty Design went bankrupt, Russ then used the Dam Things molds to manufacture trolls. Berrie claims that in 1987 his company began to modify the trolls. In 1988, Russ sent a Dam Things troll "pencil topper" to be used to make a mold and to manufacture trolls in China. In 1988 Russ also sent to China a photo of a Dam Things troll from the Russ catalog for the purpose of making a mold and manufactur-

---

**3.** According to an affidavit of Neils Dam, Thomas Dam's son, his father established Dam Things Establishment in 1962 and assigned all of his copyrights to the company. Dam Things Establishment was later succeeded by Thomas Dam Design and Copyrights AG. Finally, in 1993, that company was merged into Troll Company ApS.

ing trolls. In the 1990s, Russ obtained fifteen[4] copyright registrations for trolls—registered as derivative works of the photographs of the Dam Things trolls in the Russ catalogs.

Dam Things now claims copyright infringement of its public domain troll. This unusual claim is made possible by an act of Congress and is grounded on Dam Things' assertion that its copyright in its original troll has been restored pursuant to 17 U.S.C. § 104A. In this legislation, Congress declared that a wide range of foreign works previously in the public domain in this country, perhaps for many years, are once again afforded copyright protection. The United States took this action in an effort to comply with agreements it had entered into with foreign governments regarding intellectual property rights. Although Russ points out the "extraordinary windfall" Dam Things will receive, and the "extraordinary burden" it will bear, if Dam Things' copyright is restored, the legislature's purpose in providing these protections for foreign copyright holders was to ensure greater protection for American copyright holders abroad.

This protection results from the United States' promise, in the context of the TRIPs[5] annex to the Agreement Establishing the World Trade Organization ("WTO"), to adhere to the Berne Convention, which the United States had entered in 1989. 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 9A.04 (2001) [hereinafter *Nimmer*]. In order to comply with the Berne Convention's "Rule of Retroactivity" contained in Article 18,[6] Congress enacted the Uruguay Round Agreements Act. *Id.* The Act supplanted a previous version of § 104A (enacted only one year earlier in an effort to comply with the North American Free Trade Agreement ("NAFTA")), and provided for broad restoration of foreign works. *Id.* Section 104A of the Copyright Act now provides for automatic restoration of copyright, as of January 1, 1996, for "an original work of authorship" which meets the following requirements:

(A) is protected under subsection (a) [which provides for a term of protection equal to what the work would have received "if the work had never entered the public domain in the United States," and excepts certain works which were "ever owned or administered by the Alien Property Custodian"];

(B) is not in the public domain in its source country through expiration of term of protection;

(C) is in the public domain in the United States due to—

---

4. One additional copyright was obtained by Russ subsidiary Bright of America, Inc.

5. The United States Trade Representative has described the Agreement on Trade–Related Aspects of Intellectual Property Rights ("TRIPs") as "establish[ing] comprehensive standards for the protection of intellectual property and the enforcement of intellectual property rights in WTO member countries. It requires each WTO member country to apply the substantive obligations of the world's most important intellectual property conventions, supplement those conventions with substantial additional protection, and ensures that critical enforcement procedures will be available in each member country to safe-guard intellectual property rights." Office of the United States Trade Representative, *The Uruguay Round Agreements Act Statement of Administrative Action: Agreement on Trade–Related Aspects of Intellectual Property Rights* (1994) [hereinafter *USTR Statement*].

6. Article 18 of the Berne Convention provides: "This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection." Berne Convention for the Protection of Literary and Artistic Works (Paris Text 1971), 1161 U.N.T.S. 3.

(i) noncompliance with formalities imposed at any time by United States copyright law, including failure of renewal, lack of proper notice, or failure to comply with any manufacturing requirements;

(ii) lack of subject matter protection in the case of sound recordings fixed before February 15, 1972; or

(iii) lack of national eligibility; and

(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30–day period following publication in such eligible country.

17 U.S.C. § 104A(h)(6)(A)–(D).

Dam Things claims that its copyright in its original troll qualifies for automatic restoration in accordance with § 104A. If it does, then the copyright "shall subsist for the remainder of the term of copyright that the work would have otherwise been granted in the United States if the work never entered the public domain in the United States." 17 U.S.C. § 104A(a)(1)(B).

■ Section 104A also provides some relief for "reliance parties"—American authors who copied the restored works while they were in the public domain in the United States. 17 U.S.C. § 104A(d)(2)–(3). Section 104A defines "reliance party" in relevant part as "any person who (A) with respect to a particular work, engages in acts, before the source country of that work becomes an eligible country, which would have violated section 106 if the restored work had been subject to copyright protection, and who, after the source country becomes an eligible country, continues to engage in such acts...." 17 U.S.C. § 104A(h)(4)(A).[7] Parties who were in fact copying the restored work are given one year to sell the now infringing works after being given a "notice of intent to enforce" ("NIE") by the author of the restored work. 17 U.S.C. § 104A(d)(2). But, the statute also provides a safe harbor in the form of a mandatory license for authors of "derivative works"; they are allowed to continue manufacturing and selling their work, but must pay the author of the restored work reasonable compensation. 17 U.S.C. § 104A(d)(3).[8]

Dam Things filed this copyright infringement suit on August 22, 2001. In its complaint, Dam Things sets forth six grounds for relief, and seeks thirteen forms of relief, including injunctive relief. On August 24, 2001, the District Court entered an "Order to Show Cause" as to "why an Order should not be entered for ... preliminary injunctive relief." Both

---

7. During oral arguments, Dam Things asserted that Russ would not be protected by the provisions for reliance parties because of the lack of sales by Russ during relevant time periods. As this issue was not properly raised by Dam Things in its briefs and appears not to have been raised before the District Court, we will not address it here.

8. In its report on the Copyright Technical Amendments Act, the House of Representatives expressed its reason for providing a special provision in § 104A for derivative works: "In enacting section 104A, Congress considered the fact that restoring copyright in works that are currently in the public domain creates a potential problem: people may have used these works as the basis for new derivative works, such as motion pictures made from novels. At the time the new derivative work was created, the use of the underlying work was completely lawful, since it was in the public domain. Once copyright in the underlying work is restored, however, the continued use of the derivative work without the consent of the owner of the copyright in the underlying work would constitute copyright infringement." H.R.Rep. No. 105–25, at 12 (1997).

parties filed a series of declarations as well as briefs in support of their respective positions. The District Court concluded that Dam Things had "demonstrated a likelihood of success on its copyright infringement claim"[9] and on December 20, 2001 it entered a Second Amended Order granting Dam Things a preliminary injunction and detailing its terms. Part of this order instructs that Russ will be entirely prohibited from selling its troll dolls as of February 13, 2002—one year after the date of the NIE.[10] The Court also ordered Dam Things to pay a cash or surety bond in the amount of $100,000. The case comes before us on an expedited appeal.

## II.

■ As Dam Things brought this action to enforce an alleged copyright, the District Court exercised jurisdiction pursuant to 28 U.S.C. § 1338(a). We exercise jurisdiction over this interlocutory appeal of the District Court's issuance of a preliminary injunction pursuant to 28 U.S.C. § 1291(a)(1). We review the District Court's issuance of the preliminary injunction for an abuse of discretion. The Court of Appeals for the Second Circuit has explained: "A district court may abuse its discretion by applying an incorrect legal standard or by basing the preliminary injunction on a clearly erroneous finding of fact." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir.1994). In other words, we will still review the District Court's legal determinations and its application of the law to the facts de novo. *See Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148, 150–51 (3d Cir.2001).

■ The District Court applied the established four-prong test in order to determine whether to grant Dam Things a preliminary injunction: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *Dam Things from Denmark v. Russ Berrie & Co.*, 173 F.Supp.2d 277, 281 (D.N.J.2001) (quoting *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 154 (3d Cir.1999)). As we conclude that the District Court committed legal error in the analysis leading to its determination that Dam Things had a reasonable probability of success on the merits, we will limit our discussion to this first prong, and therefore we will examine the merits of Dam Things' claim under the statute and the District Court's treatment of it. This requires a three-step inquiry: first, does Dam Things hold a restored copyright, second, did Russ infringe Dam Things' copyright, and, third, is Russ protected by the 104A safe harbor for creators of derivative works?

### A. *Eligibility for Restoration*

#### 1. *Background*

As set forth above, 17 U.S.C. § 104A provides essentially four requirements for restoration of a foreign work's copyright that are relevant here. First, the copyright has not expired in its source country. Second, it is in the public domain in the United States because of failure to comply

---

**9.** The District Court did not consider Dam Things' other claims for relief.

**10.** There is some controversy over the date of the NIE, as Dam Things claims to have first sent an NIE to Russ in 1996. However, Russ admits that on February 13, 2001 it received a duplicate NIE sent by Dam Things. The District Court therefore adopted this as the relevant date for the purpose of the injunction.

with formalities. Third, the author of the work was a national or domiciliary of an eligible country. Fourth, the work was first published in an eligible country not less than thirty days prior to being published in the United States. The first two requirements regarding the continued existence of foreign copyright protection and the reason for the work's presence in the public domain were challenged by Russ before the District Court. However, we believe that they were properly disposed of in the Court's opinion. As to the third requirement, Russ has not challenged the fact that Thomas Dam is a national of an eligible country. We will therefore limit our discussion, as the parties did their arguments before us, to the place of first publication.

While Dam Things claims that the troll for which it seeks restoration was first published in Denmark, Russ contends that it was actually first published in the United States. Underlying this argument is the preliminary question in this case—which troll is at issue here? Dam Things has presented one troll to the Copyright Office, to the District Court, and to us as the troll whose copyright has been restored—Plaintiff's Exhibit 1 ("P1").[11] Dam Things represents this doll as "an original Good Luck troll." It was reportedly manufactured in 1959, confirmed by the fact that it is made of rubber and later dolls were made of PVC. Further, it is shown in a September, 1959 magazine being held by Thomas Dam's daughter. The doll was presented to us in a box to protect it, as the rubber doll stuffed with sawdust has become very fragile with age. The short and stout troll appears to have had four fingers and four toes which have been broken with age and are now protected by stockings. It has a cheery smile on its face, a broad nose, large brown circular eyes, large pointy ears, and a mass of shaggy, dark hair. The doll stands erect with its short arms pointing out to the sides. Although not required by statute, Dam Things applied for restoration of the copyright in this troll doll on March 9, 2000.

Russ, on the other hand, focuses its attention on what it terms "the 1961" or "Public Domain Troll." This is the troll that was the subject of Dam Things' 1961 design patent. Dam Things has referred to this at various times as a girl-like version of P1 and has also applied for a new registration for this troll in 2000 as being an "adaptation of previously published boy doll." Dam Things has not agreed that this troll was first published in 1961, and, in fact, on its 2000 copyright application it claimed it was first published in 1958. The girl-like troll that was the subject of the design patent was presented to the District Court and us as Plaintiff's Exhibit 4 ("P4"). This troll doll appears much like the first—it has four fingers on each hand and four toes on each foot, a large smile, broad nose, and large round eyes. It also stands erect with its arms outstretched, and it has a short, pudgy figure.[12] The one difference which has been pointed to and was relied on by the Copyright Office in considering P4 as a derivative work for copyright registration purposes was its rounded ears in contrast to the pointy ears of P1.

Russ does not contest before us the fact that P1 was first published in Denmark. Instead, it argues that P4 is the relevant troll because it is really the troll that Dam

---

**11.** The District Court refers to this as the "1957 Troll"; however, we do not find this label very helpful, and will instead simply refer to this troll as P1.

**12.** Photographs of these early Dam Things trolls—a boy and a girl—appeared in Danish magazines *Familie Journal* and *Femina* in 1960 along with the story of their success.

Things contends Russ infringed. Dam Things, on the other hand, suggests that P4 is not a distinct work from P1 and therefore if one of them is infringed then the other is as well. Neither party argues that all of Dam Things' trolls are identical in appearance, and both seem to concede that restoration of a copyright in a troll must of necessity be linked to a specific troll which was first used in its nation of origin other than the United States. While the standards for judging infringement and derivative works are useful in some copyright analyses, we are confronted with a creature of statute and must decide in exactly what work the copyright was restored. The parties seem to conflate the statutory requirement for restoration, with Dam Things seeking restoration of its "troll," and Russ seeking to deny restoration in Dam Things' "trolls." However, we cannot properly consider this argument framed in this fashion regarding the breadth of the copyright protection, given the fact that the myriad trolls paraded before us by Dam Things are not identical works, and the statute envisions that one must be able to identify the first publication of a tangible item, a "work," in a specific location. Here, Dam Things made clear at oral argument that P1 was the only specific item as to which restoration was sought.[13]

As the other trolls that were created after P1 are not identical works and were first used admittedly at different times and even in different locations than P1, our holding as to the restoration of P1 does not control as to *restoration* of any other specific troll. That is not to say that the

copyright restored in P1 might not provide protection for the other works based upon the appropriate originality analysis. Understandably, and appropriately, on remand the District Court will have to determine the extent of the protection provided to other Dam Things works to the extent that Russ argues that its trolls are merely derivative or even copies of Dam Things works other than P1.[14]

Our holding today as to restoration is therefore limited to P1, and our discussion of Appellant's arguments will be limited accordingly. All that we need to decide is whether, as Dam Things urges, the copyright in P1 was restored. Therefore the place where P1 was first published is what matters.

### 2. *Russ's Contentions*

#### a. Judicial Estoppel

■ Russ argues that Dam Things should be estopped from contending now that its trolls were not first published in the United States because it previously represented to the United States Patent Office and to the court during the *Scandia* litigation that P4, the troll for which it was seeking design patent protection, was first published in the United States. Russ specifically points to two statements made by Thomas Dam. First, in his patent application filed on September 1, 1960, Dam represented that he did "not believe that this design [P4] was ever known or used before [his] invention thereof or patented or described in any printed publication in any country before [his] invention thereof, or more

---

**13.** During oral argument, Dam Things asserted: "[O]nly the plaintiff, has the right to determine which is the restored work and which work gets the restored copyright. Dam did that. Judge Politan found it. It is PX1. So with all these other labels that have been given to the 1961 doll, the '64 troll, the later

dolls, the girl/boy troll, it doesn't matter. We're here saying under 17 U.S.C. 104A, the work that has been restored in PX1."

**14.** We need not decide for the purpose of this opinion whether P4 is a distinct work, a derivative work, or just a "copy" of P1.

than one year prior to this application." Second, in the course of the *Scandia* litigation, before the issues were limited solely to the matter of copyright, Thomas Dam reaffirmed the truth of this statement and also explained that P4 was "vastly different artistically" from P1.

■ We have held that judicial estoppel [15] is appropriate only where the following factors are met: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777–78 (3d Cir.2001).

■ As discussed above, our restoration analysis is limited to P1. Here the threshold requirement of inconsistency is not satisfied because the representations made regarding P4's qualification for a design patent do not pertain to P1, and, therefore, are not inconsistent with representations regarding P1's date and place of publica-

tion. Russ points to statements in the patent application and in Thomas Dam's later affidavit that specifically address the requirements for patent protection: that the design be "unobvious," 35 U.S.C. § 103(a), and that the subject of the patent has not been "described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application." 35 U.S.C. § 102. Both of these representations were made with respect to P4, however, and therefore wholly unrelated to the issue before us. Dam made no representations regarding P1, let alone regarding its date or place of first publication. Therefore, Dam Things' position here that P1 was first published in Denmark in 1958 is not "irreconcilably inconsistent" with its position before the Patent Office that P4 was not previously published outside the United States more than a year prior to the date of publication—September 1960.[16]

■ Furthermore, we have previously explained that judicial estoppel is appropriately applied in a narrow category of cases because it "is an extraordinary remedy that should be employed only when a party's inconsistent behavior would otherwise

---

**15.** Russ also contends that, in the alternative, we should apply collateral estoppel. We have "required the presence of four factors before collateral estoppel may be applied: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir.1995) (citing *United Indus. Workers v. Gov't of the Virgin Islands*, 987 F.2d 162, 169 (3d Cir.1993)). The issue here—P1's country of first publication—only possibly satisfies the fourth factor. Clearly we would not apply collateral estoppel in such a case.

**16.** Additionally, the assertions in Thomas Dam's affidavit during the *Scandia* litigation

would not properly be the subject of judicial estoppel because the statements were not adopted by the court in the course of the litigation, and therefore bad faith is not evidenced. We have explained "that a party has not displayed bad faith for judicial estoppel purposes if the initial claim was never accepted or adopted by a court or agency." *Montrose Med. Group Participating Sav. Plan*, 243 F.3d at 778 (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)). Thomas Dam's statement on the patent application could arguably satisfy this requirement because the Patent Office accepted this date in its decision to issue the design patent, and, furthermore, Dam profited thereby. However, estoppel is still improper because Russ fails to overcome the most basic requirement of inconsistency.

result in a miscarriage of justice." *Montrose Med. Group Participating Sav. Plan*, 243 F.3d at 784 (internal quotations omitted). We will not expand our application of judicial estoppel to factual settings where the specific test we have set forth is not satisfied.[17]

### b. Abandonment

▮ Russ also contends that Dam Things abandoned its copyright in P1. It points specifically to Dam Things' publication of many trolls in the United States in the 1960s without proper notice, the fact that it did not appeal the *Scandia* decision, and its admission to Scandia that the trolls were in the public domain, as acts constituting abandonment. "Abandonment occurs only if there is an intent by the copyright proprietor to surrender rights in his work." 4 *Nimmer* § 13.06. While there is a split of authority as to whether an overt act is necessary to establish abandonment, it is undisputed there must be either an act, or a failure to act, from which we can readily infer an intent to abandon the right. *See id.* (setting forth the conflicting authorities). We agree with the District Court that the acts relied upon by Russ are insufficient to establish that Dam Things intended to abandon its United States copyright. In doing so, we do not suggest that, as Dam Things proposes, abandonment may never be a bar to restoration pursuant to 17 U.S.C. § 104A.

### 3. Conclusion

▮ The District Court concluded "that [Dam Things] can prove all of the requisite

elements of § 104A and is therefore likely to succeed on the merits of its restoration claim." *Dam Things from Denmark v. Russ Berrie & Co.*, 173 F.Supp.2d 277, 286–87 (D.N.J.2001). We agree with this aspect of the District Court's ruling, as it appears that Dam Things will be able to establish that P1 satisfies all four requirements for restoration, including first publication in an eligible country.

### B. Copyright Infringement

Upon determining that the restoration of the Dam Things copyright was likely, the District Court focused on the merits of Dam Things' claim—the likelihood of success on the copyright infringement claim. The District Court's reasoning was as follows:

The Court has carefully examined the dueling trolls at issue here, and is convinced that Plaintiff has made a prima facie showing of infringement. A finder of fact who compares Russ's trolls with Dam's could not reasonably conclude that the Russ's trolls [sic] are original designs or that they comprise original expression of the idea of a troll. In the present case, all of the troll embodiments involved are very similar in appearance. This Court believes that, for purposes of copyright law, the designs are too similar to be given individual copyright protection. Contrary to Defendant's contention, Plaintiff's [sic] do not claim a copyright on the idea of a

---

**17.** Russ also tries to use Thomas Dam's prior statements to establish that P4 is a distinct work from P1 and that it was P4, not P1, which was thrust into the public domain in *Scandia*. Russ admits, however, that even if it was P4 and not P1 that was placed in the public domain via the *Scandia* litigation, P1 still is properly the subject of restoration under § 104A. As Russ itself explains: "The

statute was intended not merely to revive lapsed U.S. copyrights in foreign works, but to confer U.S. copyright protection on eligible foreign copyrighted works even if those works had not previously had a U.S. copyright." (citing *USTR Statement* at 12; 3 *Nimmer* § 9A.04[A][1]). Therefore, this argument does not help Russ defeat Dam Things' claim to restore P1.

troll or a monopoly on trolldom. Nor are they entitled to it. But Plaintiff is entitled to protect its particular, original, identifiable expression of troll.

Russ argues that it has modified Dam's designs by changing the size of the heads, changing the facial expressions, and changing the shape and size of the dolls' bodies, and that these changes are sufficient to constitute original designs. Def. Surreply Br. at 18. Simply because one troll's nose is larger or one's ears are slightly more pointed, or that a troll's mouth is opened or closed, in this Court's view, does not make these designs sufficiently distinct so as to be afforded independent copyright protection. . . .

In further defense of its trolls, Russ maintains that only minimal or slight creativity need be demonstrated in order for a work to be original. *See Feist Publications, Inc.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358. But as Defendant also points out, "something more than a 'merely trivial variation,' something recognizably 'his own' " is necessary for a showing of originality. *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99 (2d Cir.1951). Here, the Court believes that Russ's trolls contain only trivial variations from Dam's original troll, and therefore are not sufficiently original. . . .

As the foregoing analysis makes clear, this Court is convinced that all of the dolls in this case involve one basic troll design; Thomas Dam created this design in 1957 and 1958 in Gjol, Denmark. His company owns the rights to it, and it is entitled to copyright protection for the original design.

*Dam Things from Denmark*, 173 F.Supp.2d at 288–90 (D.N.J.2001) (footnotes omitted).

We believe that the District Court's analysis was too conclusory, given the complex issues of infringement and originality before it, and particularly in light of the unique challenges presented by § 104A. We are specifically concerned with the District Court's incomplete consideration of Russ's contention that its trolls would qualify as derivative works. As the United States Courts of Appeals have yet to provide any guidance as to the application of § 104A, and, additionally, as courts often confuse and even conflate the issues of infringement and originality, we will set forth the proper standards and analysis that needs to be conducted by a district court faced with an issue of whether a § 104A reliance party's work infringes and should be barred, or is a derivative work entitled to licensing.

### 1. *Infringement*

 In cases where copyright infringement is at issue, the Court should first consider whether there has been infringement by comparing each of the allegedly infringing works against the restored work.[18] The test for copyright infringement is well-established. There are two essential elements: ownership of copyright, and copying by the defendant. *Whelan Assocs., Inc. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1231 (3d Cir. 1986). Copying is proven by showing not only that the defendant had access to a copyrighted work, but also that there are substantial similarities between the two works. *Id.*; *see also Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir.1991) (footnote omitted)

---

**18.** As discussed below, the District Court need not reconsider its infringement analysis on remand because Russ has conceded that it

"performed what would have been an infringing act if the work had not been in the public domain."

("[C]opying is demonstrated when someone who has access to a copyrighted work uses material substantially similar to the copyrighted work in a manner which interferes with a right protected by 17 U.S.C. § 106.").

Following the Second Circuit's lead in *Arnstein v. Porter*, 154 F.2d 464, 468–69 (2d Cir.1946), we have further subdivided the test for substantial similarity into two considerations. *See Whelan Assocs.*, 797 F.2d at 1232 (noting our adoption of the *Arnstein* bifurcated substantial similarity test); *see also Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164–65 (9th Cir.1977) (describing the two considerations as "extrinsic" and "intrinsic"). First, the opinions of experts may be called upon in determining whether there is sufficient similarity between the works so as to conclude that the alleged infringer "copied" the work. *Whelan Assocs.*, 797 F.2d at 1232. Second, the fact-finder is to determine whether a "lay-observer" would believe that the copying was of protectible aspects of the copyrighted work. *Id.* One court has described this test as being whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 765 (2d

Cir.1991), *quoted in Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir.2001).

The Court of Appeals for the Second Circuit has termed these two considerations as "actual copying" which focuses on access in conjunction with *"probative"* similarity,[19] and "actionable copying" which considers whether there is *"substantial"* similarity between the alleged infringing work and *protectible elements* of the original work.[20] *Boisson*, 273 F.3d at 267; *see also Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C.Cir.2002) (dividing the test into the consideration of whether the defendant actually copies and whether it copied protectible aspects of the copyrighted work). The test for actual copying can be established by direct evidence or inferred by evidence of access and "similarites that are probative of copying between the works, and expert testimony." *See Laureyssens*, 964 F.2d at 140, *quoted in Boisson*, 273 F.3d at 267. However, the Supreme Court has explained that "[n]ot all copying . . . is copyright infringement." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The trial court therefore must still consider whether the copying is actionable, viewing the item through the lay person's eyes, focusing on whether the substantial similarities relate to protectible material.[21] *Boisson*, 273 F.3d at 268.

19. In *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131 (2d Cir.1992), the Second Circuit adopted the term "probative similarity" in this first portion of the test instead of "substantial similarity" because "[t]he presence of a 'substantial similarity' requirement in both prongs of the analysis—actual copying and whether the copying constitutes an improper appropriation—creates the potential for unnecessary confusion, especially because a plaintiff need not prove substantial similarity in every case in order to prove actual copying." *Id.* at 140.

20. As Nimmer has explained in his treatise on copyright: "It bears repeating, moreover, that the inquiry in this section is into improper appropriation, *i.e.*, actionable copying as a legal proposition. Although the term 'substantial similarity' often is invoked as a proxy to prove copying as a factual proposition, we have seen that the term 'probative similarity' is to be preferred in that context and the question of 'substantial similarity' arises analytically only thereafter." 4 *Nimmer* § 13.03[A].

21. A This test makes clear that "it is only after actual copying is established that one claim-

## 2. Derivative Works

 In light of the special provisions in § 104A, once a court has found infringement, it must consider whether the safe harbor provision is implicated, namely, whether the infringing works are derivatives of the restored work.[22] Just as with all other works, "originality is a constitutionally mandated prerequisite for copyright protection" for derivative works. *Feist Publ'ns, Inc.*, 499 U.S. at 351, 111 S.Ct. 1282; *see also* U.S. Const. art. I, § 8. However, all aspects of a work need not be original with the author. An author's work can utilize expression from an already existing work created by another author, or even that same author. A new work that utilizes expression from a previously existing work is considered to be derivative of that work. The Copyright Act defines a derivative work as "based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. An author's right to protection of the derivative work only extends to the elements that he has added to the work; he cannot receive protection for the underlying work. Furthermore, if the underlying work is itself protected by copyright, then he will receive no protection at all; on the contrary, he is a copyright infringer, because in order to create his work he has copied the underlying work. However, section 104A obviously creates an exception to this rule and even though the foreign author has a restored copyright, the creator of the derivative work is given special dispensation and is not considered an infringer, and is instead treated as a licensee. 17 U.S.C. § 104A(d)(3).

 In considering the originality required to qualify for copyright protection as a derivative work, the Supreme Court has explained: "To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses *at least some minimal degree of creativity*." *Feist Publ'ns, Inc.*, 499 U.S. at 345, 111 S.Ct. 1282 (emphasis added) (citations omitted). The Court went on to explain: "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* The Court of Appeals for the Second Circuit has explained: "We do follow the school of cases in this circuit and elsewhere supporting the proposition that to support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium." *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 491 (2d Cir.1976) (en banc). In *Batlin*, the Second Circuit considered whether a plastic Uncle Sam bank based on a cast iron original contained sufficient originality to satisfy the requirements for derivative works.

---

ing infringement then proceeds to demonstrate that the copying was improper or unlawful by showing that the second work bears 'substantial similarity' to protected expression in the earlier work." *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir.1998).

**22.** If, on the other hand, there was no infringement, Russ would succeed in this case and our analysis would be over. As Nimmer explains: "a work will be considered a derivative work only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work." 1 *Nimmer* § 3.01.

*Id.* The court concluded that differences as to the shape of the satchel, the leaves in the eagle's talons, and other such alterations were too minor to support a claim for originality. *Id.* at 489. By contrast, in litigation over the alleged copying of Paddington Bear, the Second Circuit found sufficient variations to constitute originality in the drawing of the bear where changes included: "the changed proportions of the hat, the elimination of individualized fingers and toes, the overall smoothing of lines—combine to give the ... drawing a different, cleaner 'look.'" *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 35 (2d Cir.1982). The court there explained that while the alterations to the new drawing were "too minor to entitle the [new] work to claim a different aesthetic appeal, [they] are still original and substantial enough to deserve independent copyright protection." *Id.* at 34–35. The Court of Appeals for the Seventh Circuit has contended that *Batlin* presented a change by the Second Circuit to a "less liberal" test requiring that a derivative work be "substantially different from the underlying work [in order] to be copyrightable." *Gracen v. Bradford Exch.*, 698 F.2d 300, 305 (7th Cir.1983).[23] The Second Circuit's analysis appears unchanged, however, as that court has reconfirmed its approach in *Batlin*: "The law requires more than a modicum of originality. This has been interpreted to require a distinguishable variation that is more than merely trivial." *Waldman Publ'g Corp. v. Landoll*, Inc., 43 F.3d 775, 782 (2d Cir. 1994) (citing *L. Batlin & Son, Inc.*, 536 F.2d at 490).

 We have similarly applied the originality test set forth in Feist that a work "must possess 'at least some minimal degree of creativity.'" *Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148, 150 (3d Cir. 2001) (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 345, 111 S.Ct. 1282). In *Southco*, we went on to explain: "Although the Court has noted that this is not a 'stringent' standard, it has also held that there is 'a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent.'" *Id.* at 151. (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 358–59, 111 S.Ct. 1282). When considering originality, therefore, the court must determine whether the author's creativity is enough to overcome a charge of triviality.

### 3. District Court's Analysis

These descriptions of the tests for copyright infringement and for derivative works illustrate the complex task that a court faces in addressing these issues. In this case, the District Court did assess the similarity between the trolls, and Russ does not challenge the Court's determination that the Russ trolls infringe Dam Things' restored copyright in P1. We therefore focus our discussion on the derivative works analysis. Unfortunately, it is not clear whether the Court actually addressed the derivative works issue which requires a determination as to originality, but, if so, it did not apply the proper standards for originality; instead, it conflated them with the requirements for infringement, which involve findings regarding similarity. Furthermore, the District Court did not properly compare the relevant trolls.

 Dam Things claims that the District Court did consider the issue of originality, because it used the magic derivative works language: "Here, the Court believes that

---

**23.** In *Gracen,* the Seventh Circuit found insufficient originality in a painting portraying Dorothy from the film version of the *Wizard of* *Oz* because it was not "substantially different from the underlying work." 698 F.2d at 304.

Russs's trolls contain only *trivial variations* from Dam's original troll, and therefore are not sufficiently original." *Dam Things from Denmark*, 173 F.Supp.2d at 288–89 (emphasis added). But, then, in the next paragraph when comparing the Dam Things trolls to one of the Russ trolls, the District Court reverted to a broader statement: "[T]hey are substantially similar in appearance, and a casual observer would be unable to differentiate the maker of these troll dolls." *Id.* at 290. The Court seems to have completely intertwined the two tests to a point where it is impossible to determine where one analysis begins and the other ends, if in fact there are two analyses. It is important to remember that by definition, derivative works are *substantially similar* to the original work, because "[a] work is not derivative unless it has been *substantially* copied from a prior work." 1 *Nimmer* § 3.01. The test for minimal creativity is therefore necessarily separate and apart from the test for substantial similarity. We cannot conclude that the District Court conducted a derivative works analysis, apart from a similarity analysis, because although the Court used the "trivial variations" language that is used to distinguish works as derivative, it never once employed the word "derivative" or noted that a second test needs to be applied.[24]

■ The distinction between the tests for infringement and for originality may be nuanced, but it does exist and must be carefully considered by the court. The Court of Appeals for the Second Circuit explained:

> The difference between these two tests is not merely academic. A work which makes non-trivial contributions to an existing one may be copyrighted as a derivative work and yet, because it retains the 'same aesthetic appeal' as the original work, render the holder liable for infringement of the original copyright if the derivative work were to be published without permission from the owner of the original copyright.

*Eden Toys*, 697 F.2d at 34.[25] The fact that the two companies' dolls have the "same aesthetic appeal" or "are very similar in appearance" does not rule out the applicability of the safe harbor for derivative works.[26]

---

24. In its consideration of restoration, the District Court briefly mentioned the reliance party issue, but seemed to misunderstand the possible implications of such status, particularly regarding whether the reliance party is a copier or a creator of an original work. The District Court explained: "Because Dam's Good Luck trolls were in the public domain when Russ 'created' its trolls, Russ indeed may have been a reliance party. The Court, however, makes no final determination on this issue today, but assumes for purposes of this motion that Russ qualifies as a reliance party." *Dam Things from Denmark*, 173 F.Supp.2d at 285 n. 9. This is further evidence that the court entirely overlooked the copy/derivative work distinction that is so vital to its ultimate determination.

25. Nimmer also provides a helpful explanation: "The standards for originality and for substantial similarity should not be confused. While a mere 'distinguishable variation' will constitute a sufficient quantum of originality so as to support a copyright in such variation, that same 'distinguishable variation' in one work may not sufficiently alter its substantial similarity to another so as to negative infringement." 4 *Nimmer* § 13.03[A].

26. At one point during its generalized comparison of the trolls, the District Court observed: "Simply because one troll's nose is larger or one's ears are slightly more pointed, or that a troll's mouth is opened or closed, in this Court's view, does not make these designs sufficiently distinct so as to be afforded independent copyright protection." *Dam Things from Denmark*, 173 F.Supp.2d at 289. Such comparisons of the trolls would be proper, but must be undertaken using the standard of more than mere trivial variations.

The District Court's analysis was also deficient in that it conducted a generalized comparison of the Dam Things trolls and the Russ trolls. In order to determine whether one work is a derivative of another, the trial judge must actually compare the exact works at issue. In this case Dam Things presented its trolls to the District Court on one occasion and Russ presented its trolls on a separate occasion. The trolls themselves were never placed into evidence. As a result, the Court never had the opportunity to compare the physical trolls of both Russ and Dam Things side-by-side. While each side places the blame for this evidentiary lapse on the other party, the placement of the blame is irrelevant. Furthermore, we will not state that as a matter of law it is insufficient for the judge to consider photos of the trolls instead of the trolls themselves. However, having ourselves been faced with a legion of trolls on counsels' tables during oral arguments, we know for a fact that the photographs are no substitute for the real thing in this case.

The District Court should have compared the relevant trolls against one another to determine whether the various Russ trolls are derivatives of P1. Without detailed consideration of the Russ trolls as against P1, the District Court determined that all of the Russ trolls and all of the Dam Things trolls are too similar to be distinguishable. It explained: "A finder of fact who compares Russ's trolls with Dam's could not reasonably conclude that the [sic] Russ's trolls are original designs or that they comprise original expression of the idea of a troll." *Dam Things from Denmark v. Russ Berrie & Co.*, 173 F.Supp.2d 277, 288–89 (D.N.J.2001). This blanket treatment relating to the trolls fell short of what is required. As we saw firsthand, these trolls come in all shapes and sizes—small pencil-toppers, and nine inch "giants," as well as grandparents, teenagers, and babies. Perhaps in the abstract one can believe that "a troll is a troll," but it is clear that all trolls cannot simply be judged alike, particularly when the inquiry must focus on distinct aspects of each. It is certainly possible that some of the Russ trolls could be considered to be derivative works while others would not. This exacting comparison needs to be made.

On remand, the District Court must reexamine Dam Things' "likelihood of success on the merits." While a party need not prove that its success is certain, and is not expected to submit all of its proof, it is essential that the District Court consider the evidence before it according to the proper legal standards. Therefore, on remand, the District Court should look at the infringing Russ trolls and individually compare each one to P1 to determine whether it constitutes a derivative work of the Dam Things troll.[27]

### III.

As the District Court conducted an incomplete legal analysis of the likelihood of Dam Things' success on the merits in this case, we will vacate the District Court's preliminary injunction order and remand this case for further consideration consistent with this opinion.[28] Costs on appeal are to be borne equally by the parties.

---

**27.** In the interest of efficiency, we suggest that the District Court consider consolidating its Rule 65 injunction hearing with its merits hearing on remand.

**28.** As the preliminary injunction is being vacated, we need not reach Russ's challenge to the amount of the injunction bond ordered by the District Court.