**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3400
_____

EVERETT ADAM JACKSON,

Appellant,

v.

CORY A. BOOKER; LISA DURDEN; MARC
BENJAMIN; MARC LEVIN; FOREST WHITAKER;
EVAN SHAPIRO; SUNDANCE CHANNEL; ED CARROLL;
RAINBOW MEDIA HOLDINGS, LLC; JAMES
DOLAN; CABLEVISION SYSTEMS CORPORATION

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 10-cv-05371)
District Judge: Honorable Jose L. Linares

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 13, 2012
Before:   SLOVITER, SMITH AND GREENBERG, <u>Circuit</u> <u>Judges</u>

(Opinion filed :  February 16, 2012)
_____

OPINION
_____

PER CURIAM

Appellant Everett Adam Jackson authored a novella, *Brick City*, and registered his

copyright under federal law in 1990.  Published by Rosebush Production Company of

Newark, New Jersey, the back cover of the 1991 paperback edition notes that: "*Brick City*

tells a story about five teenagers from a hard-life big town housing project."  From 2007

1

through 2010, Academy Award-winning actor Forest Whitaker and others produced for the Sundance Channel a television show, *Brick City*, that chronicled the real-life activities of Newark Mayor Cory Booker as he sought to bring reform to the City of Newark.

On October 18, 2010, Jackson filed a pro se complaint in the United States District Court for the District of New Jersey against Mayor Cory Booker, Directors Marc Benjamin and Marc Levin, Producers Lisa Durden and Forest Whitaker, Evan Shapiro, the Sundance Channel, and others, alleging that these defendants violated federal copyright law by adapting the particular manner of expression used in his copyrighted book. (He later clarified that his claim of copyright infringement pertained to the first season only of the show.) The defendants answered the complaint, and, thereafter, moved for summary judgment, Fed. R. Civ. Pro. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). They argued that their show was not substantially similar to Jackson's book in that the show depicted historical facts which took place after the book was written. Moreover, the book contained numerous unprotectable "scènes à faire," that is, scenes that are customary to stories about an impoverished, crime-ridden inner-city.

Jackson submitted a response in opposition to the defendants' motion for summary judgment, in which he asserted that he had previously given a copy of his book to Mayor Booker and defendant Durden. He argued that the similarities between his book and the show were too numerous and rooted in the unique and particular form of expression found in his book to be coincidental. He also argued that the "movie" was not in fact a documentary, as argued by the defendants; rather, by the producers' own admissions, it

2

was a hybrid, "genre-busting," reality series, just like his book. Among other things, Jackson argued that the show's highlighting of positive traits in Mayor Booker was inspired by the strong positive personality of high school football quarterback Jeep Thomas, one of the five main characters in his book. Mayor Booker's commitment to urban development could be traced to "The Hustler," a minor character in his book, and Principal Baraka, the real-life principal of Newark's Central High School, was a "recast" of Mr. Shell, the principal in his book. In addition, both the book and the show had a strong female romantic lead who was pregnant. Also, Mr. Abdullah dressed up like a doctor in the book and dispensed advice, and the show contained a character called the "Street Doctor," who was a community elder and activist. The "Street Doctor" in the show also was similar to "The Hustler," in that both were African-American males and ex-convicts who became community activists. Most egregiously, according to Jackson, the words "I know the kid," spoken by Angelo Bruno in the book just before Casher robbed the drug dealers, were spoken in the show after a similar crime was committed.[1]

In an order entered on July 28, 2011, the District Court granted summary judgment to the defendants. The court noted that, under Feist Publications, Inc. v. Rural Telephone Service. Co., 499 U.S. 340, 361 (1991), in order to establish copyright infringement, a plaintiff must prove two elements: "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." The defendants conceded that Jackson is the owner of a valid copyright, and thus the analysis focused on

---

[1] We note for the sake of completeness that Jackson went chapter by chapter in pointing out what he believed to be sixty-three (63) overwhelming similarities between his book and the defendants' show. We discuss only a few of those similarities here because the parties, for whom we write primarily, are well-acquainted with the contents of Jackson's response in opposition to the defendants' motion for summary judgment.

the copying prong. Since Jackson's book was published in 1990, years before the show was produced, the District Court concluded that the defendants had access to the book.

With those threshold issues resolved, the District Court noted that copying may be proved inferentially by showing that the allegedly infringing work is substantially similar to the copyrighted work. See Dam Things From Denmark, a/k/a Troll Co. ApS v. Russ Berrie & Co., Inc., 290 F.3d 548, 561 (3d Cir. 2002). A court compares the allegedly infringing work with the original work, and considers whether a "lay-observer" would believe that the copying was of protectable aspects of the copyrighted work. Id. at 562.

The District Court looked at whether there was a genuine issue of fact for a jury to decide, see Fed. R. Civ. Pro. 56(a), with respect to whether the book and the show were substantially similar. The court noted that, for purposes of summary judgment, it was undisputed that both the book and the show have the same title, *Brick City*. Moreover, on p. 99 of the book, the principal, Mr. Shell, discussed the lack of facilities and little money given to students who attend inner-city schools, and, similarly, the show addresses how budget cuts have hurt Newark public schools. But, the District Court concluded, despite these similarities, the defendants established, and Jackson did not rebut, that there are fundamental differences between the two works. These include that the book is fictional and the show is a fact-based documentary; the show focuses on the city of Newark's efforts to stop crime and the book is a fictional story about five teenagers growing up in Brick City (which Jackson wrote could be Newark, New York, Philadelphia, Chicago, or Baltimore); and the book does not discuss attempts to reform Brick City, whereas the show focuses on the city's attempt to make Newark a model of urban progress and transformation. Accordingly, there was no genuine issue of fact as to whether the book

4

and the show are substantially similar, and the defendants were entitled to judgment as a matter of law.

Jackson appeals pro se. We have jurisdiction under 28 U.S.C. § 1291. The matter is fully briefed, and we have been provided with copies of both the book and season one of the show.

We will affirm. Our review of the District Court's grant of summary judgment is plenary and we must affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We are required to view the facts in the light most favorable to Jackson, and make all reasonable inferences in his favor. See Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine issue of material fact is one that could change the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

We conclude that summary judgment was proper, because there was an insufficient evidentiary basis on which a reasonable jury could find in Jackson's favor on his claim of infringement. See Anderson, 477 U.S. at 249-50. "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer." 17 U.S.C. § 501(a). But, because not all copying is copyright infringement, see Feist Publications, 499 U.S. at 361, even if actual copying is proven, the court must decide, by comparing the allegedly infringing work with the original work, whether the copying was unlawful. See Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 208 (3d Cir. 2005). The court uses the

5

perspective of a "lay observer." Id. The "one claiming infringement [must] demonstrate that the copying was improper or unlawful by showing that the second work bears substantial similarity to protected expression in the earlier work." Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998) (internal quotation marks removed). "[T]his inquiry involves distinguishing between the author's expression and the idea or theme that he or she seeks to convey or explore," because the former is protected and the latter is not. Kay Berry, 421 F.3d at 208 (citing Baker v. Selden, 101 U.S. 99, 104-05 (1879)). The court must determine whether the allegedly infringing work is similar because it appropriates the unique expressions of the original work, "or merely because it contains elements that would be expected when two works express the same idea or explore the same theme." Id.

Here, there are only a handful of arguable similarities between the book and the show, and none of these similarities is of protectable expression. There are few real similarities between the book and the show with respect to themes, characters, dialogue, or sequence of events. The District Court properly determined that, had it read Jackson's book and seen the defendants' show, unaware of this infringement action, it would not have occurred to the court, as a lay observer, that there was any connection between the two works. The works are not "substantially similar" within the meaning of copyright law, and there was no triable issue with respect to whether the show is, as Jackson impliedly suggests, the movie version of his book.

Jackson's novel is a coming-of-age story about high school students living in the inner-city. The five main characters are Scottsboro, who is trying to find a father he has never known, his cousin Tyrone, who has been skipping school in order to practice for an

6

upcoming karate tournament, Liana, an independent but pregnant young woman, her boyfriend Jeep, the star quarterback who hopes for a college scholarship, and Casher, a former star swimmer, who gets hooked on crack cocaine and the drug dealing/gangster lifestyle. Over a short period of time, these young people encounter a variety of adults, some sinister and some helpful. A minor character known as "The Hustler" from his days as a criminal, owns a renovated house, the "Cool House," with a gym where Tyrone excels at karate lessons. Other minor characters included Mr. Shell, the high school principal who no longer believes that he can make a difference, Councilman Mizetti, who once profited illegally from a city contract but makes amends by sponsoring Tyrone's sister in a pre-medical program, and Mr. Abdullah who works in the library, dresses in costumes, and dispenses advice to Scott. Toward the end of the book, Jeep demonstrates his considerable skills in a football game, and the story ends when Casher, Jeep, and Scott are involved in a drug-related shoot-out.

Although Casher winds up in jail, Tyrone wins his tournament, Scott finds that his father is a kind and interested professor at the university, and Liana and Jeep plan a future together. Scott in particular has undergone tremendous psychological growth as the book comes to an end. After receiving advice from Professor Burns to find a skill he loves and build his life around it, he "just smiled and moved his head up and down. This was probably the best day of his life. He couldn't wait to get over to the library to tell Mr. Abdullah about the things he was learning from his newfound father. And Abdullah would have been proud to watch Scottsboro going across the bridge, because he no longer walked along on his tiptoes: he moved like a young man who knew where he was going." E. Adam Jackson, Brick City 110 (Rosebush Production Company 1991).

7

In stark contrast, the defendants' show is an unscripted look at the day-to-day life of Cory Booker, a grown man and public official, and his Police Director, Kevin McCarthy, another grown man and professional policeman, who shares Mayor Booker's commitment to reform and who institutes "Operation Impact" to reduce the number of murders in Newark. The first season of the show also focuses on Jayda, a reformed and caring unwed mother, who starts a mentoring program for young women. Although she has overcome a great deal in order to set her life straight, to finish the job she must turn herself in on an old warrant and face a charge of aggravated assault, which could send her back to jail. The show consists entirely of true, historical events which took place 17 years after Jackson obtained his copyright in his work of fiction. The cameras follow Mayor Booker to his appearances at public events, film him in interviews and in closed-door meetings, and film his interactions with his constituents. Police Director McCarthy, Newark Central High School Principal Ras Baraka, and former gang member Jayda, each interact with Mayor Booker, and are filmed in their personal and professional lives. Mayor Booker's attempts to reduce crime in Newark, and the obstacles he faces – budget cuts, political fights, and gang violence – are the central focus of the show. The murder of a 10 year-old and a series of shootings during "Red October" provide a backdrop for these efforts.

Most of the similarities identified by Jackson are unprotectable as "scènes à faire," that is, incidents, characters or settings which are as a practical matter standard in the treatment of the difficulties of life in an impoverished, urban setting. Cf. Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979 (2d Cir. 1980) ("[I]t is virtually impossible to write about" the Hindenberg without including "a scene in a German beer

8

hall, in which the airship's crew engages in revelry prior to the voyage . . . [,] common German greetings of the period, such as 'Heil Hitler,' or songs, such as the German National anthem[.]").  Jackson's one specific allegation of copied dialogue does not warrant a copyright infringement trial because the sentence "I know the kid" is not original, and its use in the show by a co-worker of Director McCarthy was entirely random and not copied.

To survive a summary judgment motion, Jackson had to rebut the defendants' showing that they did not copy any elements of his book that are protectable, Feist Publications, Inc., 499 U.S. at 361; Fed. R. Civ. Pro. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record … or (B) showing that the materials cited do not establish the absence . . . of a genuine dispute").  We have carefully considered Jackson's brief in opposition to the defendants' motion for summary judgment and the arguments he has raised in his brief on appeal, but, from a comparison of the two works, it is clear that no reasonable observer could find his book and the defendants' show substantially similar beyond the level of generalized or otherwise nonprotectable ideas.  See generally Funky Films, Inc. v. Time Warner Entertainment Co., L.P., 462 F.3d 1072 (9th Cir. 2006) (screenplay and television series, which both concerned small funeral home and the lives of family members who operated it, were not substantially similar).

For the foregoing reasons, we will affirm the order of the District Court awarding summary judgment in favor of the defendants and against Jackson.